BURKE, Judge.
The appellant, David H. Wiggins, was convicted of murdering Kyle Cavins during the course of a robbery, an offense defined as capital by § 13A-5-40(a)(2), Ala.Code 1975, and for robbing Jonathan Beasley, a violation of § 13A-8-41, Ala.Code 1975. The jury recommended, by a vote of 10 to 2, that Wiggins be sentenced to death for the capital-murder conviction. The circuit court followed the jury’s recommendation *773 and sentenced Wiggins to death for the capital-murder conviction and to life imprisonment for the robbery conviction. This appeal followed.
The State’s evidence tended to show the following. On October 29, 2005, police were dispatched to the B & E Auto Shop (“the shop”) in the Ft. Mitchell community after Kyle Cavins’s body was discovered. Daryl Powell, a sergeant with the Russell County Sheriff’s Department, testified that he was the first officer on the scene and that Cavins’s body was lying on the ground near the entrance to the shop. The medical examiner, Dr. Stephen Bourdreau, testified that Cavins had been shot in the right hip, the chest, and the right ear. The shots to the chest and the ear were fatal shots, Dr. Bourdreau said, and Cavins died as a result of multiple gunshot wounds.
Bryan McGinnis, Wiggins’s nephew, testified that he worked at the shop with Wiggins and that on October 28, 2005, McGinnis brought his deer rifle, a .35 mm Marlin, to the shop to have the sights repaired for the start of deer season. He said that when he left to go home that day he forgot the rifle and that a box of ammunition was near the rifle. He said that he did not believe that the rifle was loaded and that it was his habit to leave it unloaded. (R. 775-76.)
Brian Sizemore testified that he owned the shop, that he had worked on October 28, and that McGinnis, Cavins, and Wiggins had also worked that day. He said that McGinnis’s .35 mm rifle was put in an old Pontiac along with Sizemore’s .22 rifle. When he left the shop that day, he said, he drove his car into a ditch and called Cavins for help. At around 11:00 p.m. Cavins came with a tow truck to give him a tow and took Sizemore’s vehicle back to the shop.
Sgt. Grove Goodrich with the Russell County Sheriffs Department testified that he was dispatched to the shop on October 29, 2005, to investigate the death. He said that when he arrived at the scene Cavins’s body was on the ground, and his personal possessions, such as driver’s license, etc., were scattered all around him.
Katherine Richert, a firearms and tool-marks examiner with the Alabama Department of Forensic Sciences, testified that she tested the projectiles recovered from Cavins’s body and the gun identified as belonging to Bryan McGinnis and said that the shots that killed Cavins were fired from that gun.
Kristen Maturi, a forensic biologist with the Alabama Department of Forensic Sciences, testified that she conducted analysis on the stains found on a pair of blue jeans, a T-shirt, and a washcloth identified as belonging to Wiggins. The substance on each item was blood, Maturi said, and the blood on the jeans and shirt matched Ca-vins’s blood. The blood on the washcloth was consistent with Wiggins’s DNA, Matu-ri said.
Jonathan Beasley testified that when he entered his hunting cabin in Phenix City on October 30, a man he identified as Wiggins held a gun on him and asked for his truck and a rifle. Wiggins, he said, took his 1993 Ford Ranger truck, his money, and some cigarettes.
Wiggins testified in his own behalf. He said that he had been friends with Cavins for about seven or eight months before Cavins’s death. He said that on the day of the shooting he started drinking before noon and that he drank about 20 beers and he was also smoking “pot” and was intoxicated. Wiggins testified that he left the shop to take his nephew home and that he returned later in the evening. He testified that when Cavins came back to the shop with the tow truck he shot Cavins once, *774 but he did not remember shooting him more than once. After he shot Cavins, he said; he left to get more “dope” and exchanged the vehicle he was driving for more “dope.” Wiggins said that he eventually ended up in a cabin in Phenix City on Saturday night, that the door was open and he entered, that he lay down on the bed to get some rest, and .that when the cabin owner entered he thought it was the. police. After he left the cabin in the owner’s truck, he telephoned his mother, Wiggins said, and she convinced him to surrender to police. Wiggins testified:
“[Defense counsel]: You’re not here today to say that you didn’t kill Kyle Cavins, are you?
“[Wiggins]: No, I think that’s obvious.
“[Defense counsel]: You’re not here to say that Jeremy Johnson killed Kyle Cavins, took his truck?
“[Wiggins]: No.
“[Defense counsel]: You did all that, didn’t you?
“[Wiggins]: Yeah, that’s correct.”
(R, 1130.)
The jury convicted Wiggins of capital murder and robbery. A separate sentencing hearing was held, and the jury recommended, by a vote of 10 to 2, that Wiggins be sentenced to death. The circuit court followed the jury’s recommendation and sentenced Wiggins to death. This appeal, which is automatic in a case involving the death penalty, followed. See § 13A-5-53, Ala.Code 1975.

Standard of Review ,

.Because Wiggins has been sentenced to death, this Court must search the record of the trial-court proceedings for plain error. See Rule 45A, Ala, R.App. P. Rule 45A, provides:.
“In all cases in which the death penalty has been imposed, the Court of Criminal Appeals shall notice any plain error or defect in the proceedings under review, whether or not brought to the attention of the trial court, and take appropriate appellate action by reason thereof, whenever such error has or probably has adversely affected the substantial right of the appellant.”
In discussing the scope of the plain-error standard of review, 'the Alabama Supreme Court has stated:
“ ‘ “To rise to the level of plain error, the claimed error must not only seriously affect a defendant’s ‘substantial rights,’ but it must also have an unfair prejudicial impact on the jury’s deliberations.”’ Ex parte Bryant, 951 So.2d 724, 727 (Ala.2002) (quoting Hyde v. State, 778 So.2d 199, 209 (Ala.Crim.App. 1998)). In United States v. Young, 470 U.S. 1, 15, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985), the United States Supreme Court, construing the federal plain-error rule; stated:
“‘The Rule authorizes the Courts of Appeals to correct only “particularly egregious errors,” United States v. Frady, 456 U.S. 152, 163 (1982), those errors that “seriously affect the fairness, integrity or public reputation of judicial proceedings,” United States v. Atkinson, 297 U.S. [157], at 160 [ (1936) ]. In other words, the plain-error exception to the contemporaneous-objection rule is to be “used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result.” United States v. Frady, 456 U.S., at 163, n. 14.’
“See also Ex parte Hodges, 856 So.2d 936, 947-48 (Ala.2003) (recognizing that plain error exists only if failure to recognize the- error would ‘seriously affect the fairness or integrity of the judicial proceedings,’ and that the plain-error doc *775 trine is to be ‘used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result’ (internal quotation marks omitted)).” ■
Ex parte Brown, 11 So.3d 933, 938 (Ala. 2008).[1]
Wiggins was convicted of both capital murder and the noncapital offense of first-degree robbery. In Ex parte Woodall, 730 So.2d 652 (Ala.1998), the. Alabama Supreme Court held that a defendant who is convicted of both a capital offense and a noncapital offense; and is appealing those convictions, is not entitled to, benefit from the plain-error standard of review on the noncapital conviction. In explaining its rationale for this holding, the Alabama Supreme Court stated:
“Because the defendant in this case was sentenced to death, we have complied with our obligation ... and conducted a plain-error review.[2] However, with respect to his attempted murder conviction, for which he received a sentence of less, than death, we do not believe the defendant is entitled to benefit from our plain error review. We have found no Alabama decision dealing with the particular situation present here: a case in which plain error necessitated a reversal on a capital conviction and death sentence but in which the defendant was also sentenced to a term of imprisonment on another conviction. However, the defendant’s sentence of imprisonment for his conviction of attempted murder does not implicate the same heightened degree of concern for reliability that attended his sentence of death for the capital conviction. It is well established that where a defendant receives only a prison sentence the plain-error doctrine is not applicable and an appellate court will not consider an alleged error that the defendant -failed to preserve by making a proper and timely objection in the trial court. See Biddle v. State, 516 So.2d 846 (Ala.1987); Harris v. State, 347 So.2d 1363 (Ala.Cr.App. 1977), cert. denied, 347 So.2d 1368 (Ala. 197[7]). Indeed, it has been said that the plain-error .doctrine ‘applies to death penalty cases, but, not to other convictions.'’ Pugh v. State, 355 So.2d 386, 389 (Ala.Cr.App.), cert. denied, 355 So.2d 392 (Ala.1977) (citations omitted) (emphasis added).
“Had the defendant been convicted and sentenced to a term of imprisonment on the attempted murder count but either acquitted or sentenced to life imprisonment without the possibility of parole on the capital murder count, the plain-error doctrine would hot have applied.”
Ex parte Woodall, 730 So.2d at 665.
Thus in,accordance with Woodall, Wig; gins is not entitled to have his conviction for first-degree robbery reviewed, under the plain-error standard. In his'brief to this Court, Wiggins raises no issues concerning the validity of his robbery conviction and his sentence for that offense. Accordingly, Wiggins’s robbery conviction and sentence of life imprisonment for that conviction are due to be affirmed.
We now address the claims that Wiggins raises in his brief to this Court regarding his conviction for capital murder and his sentence of death.

ANALYSIS

I.
Wiggins argues that he was denied his constitutional right to a speedy trial *776 because there was a 41-month delay from the date of his arrest until his trial.
Wiggins failed to assert his right to a speedy trial in the lower court; therefore, our review of this claim is limited to determining whether there is plain error in that regard. See Rule 45A, Ala. R.App. P. “In Turner v. State, 924 So.2d 737, 748 (Ala. Crim.App.2002), this Court recognized that the failure of the defendant to assert his right to a speedy trial weighed against a finding of plain error regarding this claim.”' Irvin v. State, 940 So.2d 331, 343 (Ala.Crim.App.2005).
The Sixth Amendment to the United States Constitution guarantees a criminal defendant the right to a speedy trial. That right is likewise guaranteed in the Alabama Constitution. See Art. I, § 6, Ala. Const.1901. In Barker v. Wingo, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972), the United States Supreme Court set out the following four factors to be weighed when determining whether an accused has been denied his or her constitutional right to a speedy trial. We consider: (1) the length of the delay; (2) the reasons for the delay; (3) the accused’s assertion of his or her right to a speedy trial; and (4) the degree of prejudice suffered by the accused due to the delay.
‘“A single factor is not necessarily determinative, because this is a “balancing test, in which the conduct of both the prosecution and the defense are weighed.” ’ Ex parte Clopton, 656 So.2d [1243] at 1245 [(Ala.1985)] (quoting Barker [v. Wingo ], 407 U.S. [514] at 530 [ (1982) ]). We examine each factor in turn.”
Ex parte Walker, 928 So.2d 259, 263 (Ala. 2005).

Length of Delay

“In Alabama, ‘[t]he length of delay is measured from the date of the indictment or the date of the issuance of an arrest warrant — whichever is earlier — to the date of the trial.’ ” Ex parte Walker, 928 So.2d at 264.
Here, Wiggins was arrested in October 2005 and was tried in March 2009. Approximately 41 months elapsed between the date of his arrest and the date of his trial. This Court has held that delays of 41 months are presumptively prejudicial. See State v. Stovall, 947 So.2d 1149 (Ala. Crim.App.2006) (holding that delay of 41 months is presumptively prejudicial); Irvin v. State, 940 So.2d 331 (Ala.Crim.App. 2005) (holding that delay of 32 months is presumptively prejudicial); Vincent v. State, 607 So.2d 1290 (Ala.Crim.App.1992) (holding that delay of 31 months is presumptively prejudicial). The delay in this case is presumptively prejudicial; therefore, we examine the remaining Barker factors.

Reasons for the Delay

Because Wiggins did not assert his right to a speedy trial, there is little we can glean from the record concerning the reasons for the delay. The record does show that defense counsel filed no motions until July 2007, at which time counsel filed 29 motions on the same date. Also, in August 2007, Wiggins moved for a psychiatric evaluation and that motion was granted. The case-action-summary sheet does indicate that the case was first set for trial in March 2009. The following discussion occurred before trial:
“The Court: I set this ease for a trial a year ago last-January, and it got continued because you said you had a conflict, that you were to be in a murder trial in Lee County, and that case got disposed of and you wound up not having a conflict. This case got continued for trial a year ago because of you, [defense counsel].
*777 “[Defense counsel]: And the Court did not rule on any motions until sometime in July and the rest of them in October. “The Court: Because you weren’t ready to try the case.
“[Defense counsel]: So—
“The Court: The continuance was based upon your request.”
(R. 700.)
The bulk of the delays appear to have been caused by motions filed by Wiggins. “‘Delays occasioned by the defendant or on his behalf are excluded from the length of delay and are heavily counted against the defendant in applying the balancing test of Barker.’” Zumbado v. State, 615 So.2d 1223, 1234 (Ala.Crim.App. 1993), quoting McCallum v. State, 407 So.2d 865, 868 (Ala.Crim.App.1981). “[W]e see no deliberate delay by the State to enhance its own case or to prejudice the defense.” Irvin v. State, 940 So.2d 331, 343 (Ala.Crim.App.2005). This factor does not weigh in Wiggins’s favor.

Assertion of the Right

As stated above, Wiggins did not ñle a motion for a speedy trial. The United States Supreme Court has recognized that the failure to assert the denial of a speedy trial does not waive that claim; however, it “will make it difficult for a defendant to prove that he was denied a speedy trial.” Barker v. Wingo, 407 U.S. at 532.
“‘The fact that the appellant did not assert his right to a speedy trial sooner “tends to suggest that he either acquiesced in the delays or suffered only minimal prejudice prior to that date.” ’ Clancy v. State, 886 So.2d 166, 172 (Ala. Crim.App.2003), quoting Benefield v. State, 726 So.2d 286, 291 (Ala.Crim.App. 1997), and Brown v. State, 392 So.2d 1248, 1254 (Ala.Crim.App.1980) (no speedy-trial violation where defendant asserted his right to a speedy trial three days before trial).”
Yocum v. State, 107 So.3d 219, 224 (Ala. Crim.App.2011). Thus, this factor does not weigh in Wiggins’s favor.

Prejudice to the Defendant

When evaluating the prejudice prong of the Barker factors, the Alabama Supreme Court has said:
“[W]e consider the ‘interests of defendants which the speedy trial right was designed to protect....: (i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired.’ Barker v. Wingo, 407 U.S. at 532, 92 S.Ct. 2182 [ (1982) ].”
Ex parte Anderson, 979 So.2d 777, 781 (Ala.2007).
“In cases involving lengthy delay, prejudice may be presumed. Doggett [v. United States ], 505 U.S. [647, 655], 112 S.Ct. [2686,] 2693 [ (1992) ]. Where the Government has pursued its prosecution with reasonable diligence, however, specific prejudice must still be shown. Id. This is especially true where the delay is reviewed only for plain error. [United States v.] Olano, 507 U.S. [725, 735], 113 S.Ct. [1770,] 1778 [ (1993) ]. Hayes argues that one witness was unable to recall certain events in her trial testimony. Beyond this, he asserts only a vague allegation that he was prejudiced by the ‘erosion of exculpatory evidence and testimony.’
“Such conclusory allegations do not establish the required showing of prejudice to prevail under the plain error standard. This court has consistently held that conclusory assertions of prejudice, including unsubstantiated allegations of witnesses’ faded memories, are *778 insufficient to constitute proof of actual prejudice. See e.g., [United States v.] Young, 906 F.2d [615] at 620 [(11th Cir.1990) ]; United States v. Russo, 796 F.2d 1443, 1451 (11th Cir.1986).”
United States v. Hayes, 40 F.3d 362, 366 (11th Cir.1994).
Wiggins asserts that the delay in this case was inexcusable because, he says, the case was not complicated in that Wiggins had confessed. He asserts that the circuit court used the lengthy delay to not allow him to plead guilty after Wiggins failed to accept the plea offer before the plea deadline. There is absolutely nothing in the record that supports Wiggins’s claim that the circuit court used the lengthy delay as an excuse not to accept Wiggins’s untimely acceptance of the State’s plea offer.[3] The record shows that plea negotiations did not begin' until approximately one month before Wiggins’s trial. The record does not support Wiggins’s first-time claim that he was denied his constitutional right to a speedy trial. For these reasons, Wiggins is' due no relief on this claim.
II. ‘
Wiggins next argues that the circuit court erred in not allowing him to accept the plea offer made by the prosecutor. Specifically, he argues'that the circuit court abused its discretion in imposing a deadline for Wiggins to accépt the State’s offer and that that deadline violated his constitutional rights because he was ultimately sentenced'to death.
The record does not contain a copy of any proposed plea agreement'between the State and Wiggins. However, it appears that in exchange for Wiggins’s plea to capital murder the State agreed to recommend a sentence of life imprisonment without the possibility of parole. A hearing was held in February '2009 concerning the proposed plea offer at which the circuit court conducted an extensive colloquy with Wiggins. Wiggins stated for the record that he had spoken to his attorney, that he wished to decline the plea offer, that he knew that he faced the death penalty if convicted, and that he felt there was a chance that he might be convicted of a lesser included offense. (R. 120.) The circuit court gave Wiggins numerous opporr tunities to change his plea and at the conclusion of the hearing stated that Wiggins had until the end of that day to inform the court if he wished to change his plea. (R. 123.)
' During voir dire examination of the prospective jurors the plea offer was mentioned again, and defense counsel indicated that the plea offer' had been' withdrawn when Wiggins failed to accept it within the prescribed time. (R. 503.) At the end of the first day of _ trial, the prosecutor informed the court that the district attorney’s office had been approached by Wiggins’s family members and had been told that Wiggins’s attorney had urged Wiggins not to accept the State’s plea offer. The following then occurred:
“[Defense counsel]: Your Honor, if I might, for further enlightenment regarding that, I spoke with Mr..Dana Gentry, who had represented Mr. Wiggins earlier in these proceedings, and he had had Mr. Gordon McGinnis, who is the brother of Mr. Wiggins, and he had talked with him and his mother had talked with [Wiggins], and they were given the impression somehow that I had in some way told [Wiggins] that I felt like he should continue to go to trial rather than taking a plea of guilty.
[[Image here]]
*779 “I have never ever told [Wiggins] that he should not take the plea offer from the District Attorney’s office....
“Mr. McGinnis has been in contact with Mr. Gentry and has — the mother finally got a chance to talk with her son on Saturday, and that’s why we had broached the subject of whether or not [Wiggins] could still take that recommendation from the District Attorney’s office which had been withdrawn as a result of his failure to act on that particular day.
“The Court: Of course; he can enter a plea of guilty. It’d just be without a recommendation.”
(R. 503-04.) Defense counsel indicated that Wiggins would not be entering a plea at that time.
After the jury returned a verdict convicting Wiggins of capital murder, defense counsel then filed a motion for reconsideration and argued that Wiggins did not have an opportunity to- talk to his family before declining the plea offer, that the plea offer was made four and one-half weeks before trial, and that Wiggins had now had an opportunity to talk to his family and wished to change his plea.- (R. 1248.) ; The circuit court indicated that it was too late because the jury .had already convicted Wiggins.
In Wiggins’s motion for a- new trial, defense counsel argued that the circuit court erred in not accepting Wiggins’s plea. In rejecting this claim, the circuit court stated:
“David Wiggins had been offered by the District Attorney’s Office of Russell County a plea bargain offer several weeks in advance of-February 19, 2009. The Court was informed that Mr. Wiggins had turned down the State’s offer. The Court on its own motion brought David Wiggins to Court to give him an opportunity to enter a plea of guilty [and a sentence] of life imprisonment without parole. David Wiggins again turned the offer down. The Court gave him an additional two hours to reconsider.- His attorney, the Hon. Joel Collins relayed to the Court that his client would not change his mind and enter a. plea- of guilty. Mr. Collins also did not ask for an additional extension- for Mr. Wiggins to consult with his family. The court also points out that the Defendant, David Wiggins, committed this capital murder offense more than three years prior to February 19, 2009, and had numerous opportunities to consult with his family.”
(R.. 423.)
“A criminal defendant does ■ not have an absolute right under the Constitution to have his guilty plea accepted by the court....” North Carolina v. Alford, 400 U.S. 25, 38 n. 11, 91 S.Ct. 160, 27 L.Ed.2d 162 (1970). Rule 14.3, Ala. R.Crim. P., addresses plea -negotiations and plea agreements. Rule 14.3(a) provides:
“The prosecutor and the defendant or defendant’s attorney may engage in discussions with a view toward reaching an agreement that, upon the entering of a plea of guilty to a charged offense or to a lesser or related offense....”
Rule 14.3(b) specifically provides that a trial court has discretion to either accept or reject a plea agreement. Rule 14.3(d) also recognizes that a plea offer may be withdrawn. However, Rule 14.3 does not address the scope of a court’s discretion in regard to the plea process.
Many states have considered the validity of a court’s, setting- time constraints on a defeiidant’s acceptance- of a plea offer. The Colorado -Supreme Court in People v. Jasper, 17 P.3d 807 (Colo.2001), considered this issue. We quote extensively, from that very thorough opinion:
*780 “Plea bargains in criminal law are an accepted part of our jurisprudence and are specifically sanctioned by statute, court'rule and case law. ‘Where it appears that the effective administration of criminal justice will thereby be served, the district attorney may engage in plea discussions for the purpose of reaching a plea agreement.’ § 16-7-301(1); Crim. P. 11(f)(1). “‘[P]lea bargaining” is an essential component of the administration of justice.’ Santobello v. New York, 404 U.S. 257, 260, 92 S.Ct. 495, 30 L.Ed.2d 427 (1971).
“Trial courts, however, possess discretion to accept or to reject a plea agreement because ‘[tjhere is no absolute right to have a guilty plea accepted.’ Santobello, 404 U.S. at 262, 92 S.Ct. 495; see also Mabry v. Johnson, 467 U.S. 504, 507, 104 S.Ct. 2543, 81 L.Ed.2d 437 (1984) (concluding that a plea bargain, until a court accepts it, is without any constitutional significance); People v. Birdsong, 937 P.2d 877, 880 (Colo.App. 1996), rev’d on other grounds, 958 P.2d 1124 (Colo.1998). Our rules and statutes require that ‘[t]he judge in every case should exercise an independent judgment in deciding whether to grant charge and sentence concessions.’ § 16-7-302(3); Crim. P. 11(f)(5). If, when it rejects a proposed plea bargain, a trial court acts within its sound discretion, then a court fulfills the mandate of independent judgment under Rule 11 and section 16-7-302. Cf. Santobello, 404 U.S. at 262, 92 S.Ct. 495 (‘A court may reject a plea in exercise of sound judicial discretion....’); [United States v.] Moore, 916 F.2d [1131] at 1136 [(6th Cir.1990)] (‘[T]he Supreme Court did not intend to allow district courts to reject pleas on an arbitrary basis.’); [United States v.] Delegal, 678 F.2d [47] at 50 [ (7th Cir.1982) ] (same).
“However, as the court of appeals points out in this case, neither the rule nor our case law articulates the contours of what constitutes the exercise of either sound discretion or independent judgment in this area. [People v.] Jasper, 984 P.2d [1185] at 1186 [ (Col.App. 1999) ]. Thus, to determine whether rejection of a plea bargain solely because the bargain is tendered after the plea cutoff deadline may constitute the exercise of independent judgment, or is merely an arbitrary action, we review analogous rules of criminal procedure and consider case law from other jurisdictions as well as other authorities.
“Although our rules do not expressly provide that a court may exercise its discretion by enforcing a plea cutoff deadline, our rules vest trial courts with similar authority to impose and enforce pretrial deadlines upon the parties in the following similar circumstances: Crim. P. 16(V)(b)(l) instructs the court to set a deadline for the defendant to disclose statements of experts and the nature of his defense to the prosecution; Crim. P. 16(V)(b)(3) allows the court to alter discovery time limits if either party shows good cause to do so; and Crim. P. 16(IV)(b)(l) permits a trial court to set a time for an omnibus hearing.
“Recently, we acknowledged the trial court’s responsibility to manage criminal cases, which ‘includes the setting of reasonable controls on attorneys trying the case.’ People v. Berreth, 13 P.3d 1214, 1218 (Colo.2000) (concluding that docket and administrative concerns are within the control of a trial judge). The American Bar Association (ABA) also advocates that the court, and not the attorneys, set the schedule for cases because ‘only the court is in a position to provide orderly and impartial direction to the movement’ of cases. ABA, The Improvement of the Administration of Jus *781 tice 37 (6th ed.1981). Thus, we conclude that the setting of deadlines for pretrial matters constitutes an integral part of a trial court’s case management authority.
“Case management by the trial court promotes policies of judicial efficiency and economy. We must interpret our rules of criminal procedure ‘to secure simplicity in procedure, fairness in administration, and the elimination of unjustifiable expense and. delay.’ Crim. P. 2. We have stated that ‘seasonal disposition of a case by plea agreement results in more effective use of court time and cuts down on the inconvenience and expense occasioned by last-minute dispositions after a jury panel has been assembled and witnesses have been subpoenaed.’ Barela v. People, 826 P.2d 1249, 1253 (Colo.1992). The need to provide for efficient and sound judicial administrative practices, dictated by both our rules of procedure and case law, compels a construction of Rule 11 that permits the use of timely plea bargains which in turn support the efficient administration of justice.
“Other jurisdictions, such as Michigan, New Jersey, and California, conclude that plea cutoff deadlines are an effective means of reducing confusion, delay and expense. See People v. Grove, 455 Mich. 439, 566 N.W.2d 547, 558 (1997) (agreeing with the court of appeals that the use of a plea cutoff date ‘enhanced [the court’s] docket control, eliminated unjustifiable expense and delay, and was, therefore, proper’); People v. Brimage, 271 N.J.Super. 369, 638 A.2d 904, 907 (App.Div.1994) (When fairly applied, plea cut-off is highly effective and is probably the key to the extraordinary efficiency found in several [New Jersey] counties.’); People v. Cobb, 139 Cal.App.3d 578, 188 Cal.Rptr. 712, 713 (1983) (concluding • plea cutoff deadlines reduce ‘the confusion, hardship and inconvenience inherent in calling calendars’).
“The Eleventh Circuit also concludes that ‘the prerogative of prosecutors and defendants to negotiate guilty pleas is '“outweighed by judicial discretion to control the scheduling of trial proce- ' dures in ongoing prosecutions, plus the broad interests of docket control ánd effective utilization of jurors and witnesses.” ’ United States v. Gamboa, 166 F.3d 1327, 1331 (11th Cir.1999) (quoting United States v. Ellis, 547 F.2d 863, 868 (5th Cir.1977)); see also Cobb, 188 Cal. Rptr. at 716 (‘The purpose of improving calendar management justifies the setting of deadlines beyond which no conditional plea may be taken.’).
“Empirical research further supports the notion that plea cutoff deadlines assist the processing of cases more quickly, which in.turn results in the efficient administration of justice. See Ernest C. Friesen et al., Justice in Felony Courts: A Prescription to Control Delay: A Report on a Study of Delay in Metropolitan Courts During 1978-1979 32 (advocating for courts to enforce plea cutoff deadlines to promote meaningful plea discussions); David C. Steelman, Case-flow Management: The Heart of Court Management in the New Millennium 49-50 (2000) (determining that it is in the court’s interest to provide for meaningful plea discussions by enforcing plea cutoff dates); Mary Lee Luskin and Robert C. Luskin, Criminology: Why So Fast, Why So Slow?: Explaining Case Processing Time, 77 J.Crim. L. & Criminology 190, 197, 209 (1986) (finding in their studies that case management techniques, which included setting plea cutoff deadlines, dramatically cut case processing time).
[[Image here]]
*782 “In sum, a number of factors persuade us that a trial court’s case management authority includes the ability to reject proposed plea bargains tendered after plea cutoff deadlines. A.defendant does not possess an absolute right to plead guilty. Our rules .of procedure vest trial courts with significant similar control over pretrial matters. We must construe our rules of criminal procedure to promote efficient judicial administration. The use of plea cutoff deadlines provides the trial court with a management tool that increases the efficient operation of the courts for the benefit of all citizens. Thus, we disagree with the court of appeals that a trial court acting pursuant to its case management authority acts arbitrarily by enforcing a plea cutoff date. We hold that it is not an abuse of discretion for the trial court to reject a plea bargain solely for failure to tender it before a court-imposed plea deadline.”
People v. Jasper, 17 P.3d 807, 812-13 (Colo.2001).
The United States Court of Appeals for the Eleventh Circuit, in recognizing a trial court’s discretion to enforce a deadline for accepting a plea offer, has stated:
“[I]t was not an abuse of discretion to reject the guilty pleas because they were tendered after the court-imposed deadline. We have held that the prerogative of prosecutors and defendants to negotiate guilty pleas is ‘outweighed by judicial discretion to control the scheduling of trial procedures in ongoing prosecutions, plus the broad interests of docket control and effective utilization of jurors and witnesses.’ United States v. Ellis, S47 F.2d 863, 868 (5th Cir.1977). Thus, courts may reject guilty pleas that are tendered after a deadline’ set by the court. See id.
“The district court in this case concluded that the 9:00 a.m. deadline was necessary to prevent the needless waste of the jury’s time and for effective management of its docket. In setting this deadline, the court provided sufficient opportunity for the defendants to discuss the Government’s offer with their attorneys; it arranged for the defendants, their attorneys, and the interpreter to stay after the court recessed for the day in-order to reach a decision. Three of the defendants, in fact, decided to accept the Government’s offer before the deadline expired. The court did not abuse its' discretion by rejecting the guilty pleas when the fourth defendant failed to meet the deadline.”
United States v. Gamboa, 166 F.3d 1327, 1331 (11th Cir.1999). But see State v. Sears, 208 W.Va. 700, 705, 542 S.E.2d 863, 868 (2000) (“[W]hen a criminal defendant and the prosecution reach a plea agreement, it is an abuse of discretion for the circuit court to summarily refuse to consider the substantive terms of the agreement solely because of the timing of the presentation of the agreement to the court.”).
Here, there is no assertion that Wiggins or his counsel were not aware of the circuit court’s deadline. Indeed, the record clearly, shows that Wiggins was fully .informed and that the circuit court went out of its way to ensure that Wiggins realized the consequences of his failure to accept the State’s plea offer. The circuit court did not abuse its considerable discretion in imposing a deadline for Wiggins’s acceptance of the State’s plea offer. See People v. Jasper, supra. Wiggins’s constitutional rights were not violated. For these reasons, Wiggins is due no relief on this claim.
III.
Wiggins next argues that the circuit court erred in denying his motion to suppress the statement he' made to law-enforcement officials because, he says, the *783 statement was involuntary. Specifically, he argues that the statement was involuntary because he was interrogated after a prolonged period of drug use, he had' spent an entire weekend without food or sleep, the police took advantage of his weakened state, and the police coerced him to make a confession by telling him that his only chance at “normalcy” was to make a statement.
Before trial Wiggins filed a lengthy motion to suppress his statement to police. (C.R. 300-03.) The circuit court held a hearing on that motion. (R. 53-117.) Investigator Steve Johnson with the Russell County Sheriffs Office testified that Wiggins gave a statement to police on thé day after the murder, October 30, 2005, that Wiggins voluntarily surrendered to authorities that day, that Wiggins’s attorney accompanied him when he came to the police station to surrender, that Wiggins was placed' in an interview room that was equipped with audio- and video-recording devices, that before Wiggins made a statement he was advised of his Miranda[4] rights, that Wiggins indicated that,he understood those rights, that Wiggins signed a waiver-of-rights form, that Wiggins did not appear to be intoxicated or under the influence of any drug or narcotic, that Wiggins was given a chance to use the facilities before speaking with police, that Wiggins was offered food and beverages, that he did not request any food but he was given food and drink anyway, that he did not appear to be sleep deprived, that he was not coerced or influenced in any way to make a statement, that his attorney was present with him during the entire interview, that Wiggins was offered no deal or any incentive m order to make a statement, that Wiggins appeared to be very remorseful, and that the statement lasted about two or three hours.
Lt. Heath Taylor of the Russell County Sheriffs Department also testified at the suppression hearing. He said that he was present for Wiggins’s interview, that in his opinion Wiggins did not appear to be under the influence at the time, that Wiggins was given bathroom, drink, and food breaks, and that Wiggins was very cooperative and remorseful.
In rebuttal, 'Wiggins called attorney Dana Gentry to testify. Gentry testified that .'Wiggins understood the charges against him, that he wanted to make a statement, that he was not coerced, that Gentry felt it was in Wiggins’s best interest to make a statement,' and that Wiggins did not appear to be intoxicated. He stated that he had spoken with a representative from the district attorney’s office in the hope that if Wiggins made a statement the State would take the death penalty off the table, but, he said, the State would not make a deal. At the conclusion of this hearing, the circuit court denied Wiggins’s motion to suppress, (ill 107; C.R. 321.) In the statement, Wiggins confessed that he shot Cavins and that he robbed a man identified as Jonathan Beasley.
In reviewing ‘a circuit' court’s ruling on a motion to suppress a statement we apply the standard articulated by the Alabama Supreme Court in McLeod v. State 718 So.2d 727 (Ala.1998):
“Por a confession, or an inculpatory statement, to be admissible, the State must prove by a preponderance of the evidence that it was voluntary. Ex parte Singleton, 465 So.2d 443, 445 (Ala. 1985). The initial determination is made by the trial courtSingleton, 465 So.2d at 445. The trial court’s' determination will not be disturbed unless it is contrary to the great weight' of the evidence *784 or is manifestly wrong. Marschke v. State, 450 So.2d 177 (Ala.Crim.App. 1984)....
“The Fifth Amendment to the Constitution of the United States provides in pertinent part: ‘No person .,. shall be compelled in any criminal case to be a witness against himself_’ Similarly, § 6 of the Alabama Constitution of 1901 provides that ‘in all criminal prosecutions, the accused ... shall not be compelled to give evidence against himself.’ These constitutional guarantees ensure that no involuntary confession, or other inculpatory statement, is admissible to convict the accused of a criminal offense. Culombe v. Connecticut, 367 U.S. 568, 81 S.Ct. 1860, 6 L.Ed.2d 1037 (1961); Hubbard v. State, 283 Ala. 183, 215 So.2d 261 (1968).
“It has long been held that a confession, or any inculpatory statement, is involuntary if it is either coerced through force or induced through an express or implied promise of leniency. Bram v. United Staten, 168 U.S. 532, 18 S.Ct. 183, 42 L.Ed. 568 (1897). In Culombe, 367 U.S. at 602, 81 S.Ct. at 1879, the Supreme Court of the United States explained that for a confession to be voluntary, the defendant must have the capacity to exercise his own free will in choosing to confess. If his capacity has been impaired, that is, ‘if his will has been overborne’ by coercion or inducement, then the confession is involuntary and cannot be admitted into evidence. Id. ...
“The Supreme Court has stated that when a court is determining whether a confession was given voluntarily it must consider the ‘totality of the circumstances.’ Boulden v. Holman, 394 U.S. 478, 480, 89 S.Ct. 1138, 1139-40, 22 L.Ed.2d 433 (1969); Greenwald v. Wisconsin, 390 U.S. 519, 521, 88 S.Ct. 1152, 1154, 20 L.Ed.2d 77 (1968); see Beecher v. Alabama, 389 U.S. 35, 38, 88 S.Ct. 189, 191, 19 L.Ed.2d 35 (1967). Alabama courts have also held that a court must consider the totality of the circumstances to determine if the defendant’s will was overborne by coercion or inducement. See Ex parte Matthews, 601 So.2d 52, 54 (Ala.) (stating that a court must analyze a confession by looking at the totality of the circumstances), cert. denied, 505 U.S. 1206, 112 S.Ct. 2996, 120 L.Ed.2d 872 (1992); Jackson v. State, 562 So.2d 1373, 1380 (Ala.Crim. App.1990) (stating that, to admit a confession, a court must determine that the defendant’s will was not overborne by pressures and circumstances swirling around him); Eakes v. State, 387 So.2d 855, 859 (Ala.Crim.App.1978) (stating that the true test to be employed is ‘whether the defendant’s will was overborne at the time he confessed’)_”
718 So.2d at 729 (footnote omitted).
In regard to allegations that a defendant was fatigued and/or intoxicated thus rendering a statement involuntary, the United States Court of Appeals for the Eighth Circuit has stated:
“Sleeplessness, alcohol use and drug use are relevant to our analysis, but ‘[i]ntoxication and fatigue do not automatically render a confession involuntary.’ United States v. Casal, 915 F.2d 1225, 1229 (8th Cir.1990). Instead, ‘the test is whether these mental impairments caused the defendant’s will to be overborne.’ Id. For instance, we have upheld the conclusion that a suspect who recently used methamphetamine and had not slept for five days voluntarily waived his Miranda rights where police officers testified that they had no knowledge of these alleged impairments and the suspect did not act intoxicated. Id. *785 Similarly, we have upheld a district court’s conclusion that a suspect who used methamphetamine the evening before and marijuana the day he waived his rights consented voluntarily because police officers testified he appeared ‘sober and in control of his facilities.’ United States v. Contreras, 372 F.3d 974, 977 (8th Cir.2004).”
United States v. Gaddy, 532 F.3d 783, 788 (8th Cir.2008).
We have reviewed Wiggins’s statement to police. There is no indication that Wiggins was intoxicated or in any way incapable of making a voluntary statement.' In fact, Wiggins appeared in control throughout the proceedings. The totality of the circumstances clearly supports the circuit court’s ruling that Wiggins’s statement was voluntary, that it was not coerced, and that it was properly admitted into evidence.
Moreover, the United States Supreme Court in Arizona v. Fulminante, 499 U.S. 279, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991), first held that the erroneous admission of a defendant’s confession may be considered harmless error. The court said:
“When reviewing the erroneous admission of an involuntary confession, the appellate court, as it does with the admission of other forms of improperly admitted evidence, simply reviews the remainder of the evidence against the defendant to determine whether the admission of the confession was harmless beyond a reasonable doubt.”
Arizona v. Fulminante, 499 U.S. at 310. “ ‘In order for the harmless error doctrine to be applied in this situation, the evidence against the accused must be overwhelming.’ Smith v. State, 623 So.2d 369, 372 (Ala.Cr.App.1992).” McCray v. State, 629 So.2d 729, 732 (Ala.Crim.App.1993). Wiggins’s trial testimony was virtually identical to his statement to police. Thus, even if Wiggins’s statement was erroneously received into evidence, and we hold that it was not, its admittance was harmless beyond a reasonable doubt. See Arizona v. Fulminante, supra.
For these reasons, the circuit court committed no error in denying Wiggins’s motion to suppress his statement to law-enforcement officials. Wiggins is due no relief on this claim.
IV.
Wiggins next argues that the circuit court erred in refusing to grant his request to invoke the witness-sequestration rule. The record shows that after the State’s first two witnesses, Sgt. Daryl Powell of the Russell County Sheriffs Department and Bryan McGinnis, completed their testimony, the following occurred:
“[Defense counsel]: Your Honor, at this time I would invoke the rule.
“The Court: It’s too late.”
(R. 793-94.) Wiggins argues in his brief to this Court that the rule regarding sequestration, Rule 615, Ala. R. Evid., contains no provision concerning the time in which a request to sequester the witnesses must be made; therefore, the circuit court erred in denying his late request.
Rule 615 provides:
“At the request of a party the court may order witnesses excluded so that they cannot hear the testimony of other witnesses and it may make the order of its own motion. This rule does not authorize exclusion of (1) a party who is a natural person, (2) an officer or employee of a party which is not a natural person designated as its representative by its attorney, (3) a person whose presence is shown by a party to be essential to the presentation of the party’s cause, or (4) a victim of a criminal offense or *786 the representative of a victim who' is unable to attend, when the representative has been selected by the victim, the victim’s guardian, or the victim’s family.” [5]
(Emphasis added.)
Wiggins fails to identify, in his brief, the specific witnesses who he maintains should have been excluded from the courtroom under the rule but. who were not. He merely cites three pages in the record that correspond to the testimony of Sgt. Grover Goodrich and Investigator Rod Costello, both of the Russell County Sheriffs Department, and the victim’s widow, Connie Cavins.
“The purpose of the witness sequestration rule is to prevent any one witness from hearing the testimony of other witnesses and perhaps perceiving the value of his own testimony to one party or the other.” Ex parte Faircloth, 471 So.2d 493, 496 (Ala.1985). Alabama courts' have repeatedly recognized that investigating officers and representatives of the victim may be excluded from the rule. See Whitehead v. State, 777 So.2d 781 (Ala.Crim.App.1999) (holding that family members of the victim were properly excluded from the rule); Ex parte Lawhorn, 581. So.2d 1179, 1181 (Ala. 1991) (“Alabama appellate courts have time and again refused -to hold it an abuse of discretion on the part of a trial court tó allow a sheriff, police chief, or similarly situated person who will later testify to remain in the courtroom. during trial.”). Thus, the three witnesses cited above could have been properly, excluded from the rule had it been timely invoked. ,
The Oklahoma Court of Criminal Appeals has specifically' addressed whether the .denial of a - untimely motion to invoke the witness-sequestration rule constituted reversible error. Oklahoma’s statute providing for the sequestration of witnesses, 12 Old. St. Ann. § 2615 (1981),[6] is similar to the federal rule and, unlike the Alabama rule, contains the word “shall” instead of “may.” In finding no reversible error, the court stated:
“Appellant requested the rule after the State had called the second of its three witnesses. The trial court denied the request telling Appellant it was too late. In Kelsey v. State, 744 P.2d 190, 193 (Okla.Cr.1987), the defense did not request the rule of sequestration until the fourth of six state witnesses. This Court held that the better. practice would have been for the trial court to either invoke the rule upon request or grant appropriate exceptions consistent with the exercise of sound discretion. However, as the request of defense counsel was not timely and no showing of prejudice- was made, we refused to find reversible error. The rationale of Kelsey is applicable to the present case. It would have been better for the trial court to either invoke the rule of sequestration or grant an appropriate exception. However, in light of defense counsel’s failure to make a timely request and in the absence of any showing of prejudice by Appellant, we cannot say that reversible error occurred.”
Davis v. State, 792 P.2d 76, 85 (Okla.Crim. App.1990). See also Jay M. Zitter, J.D., Prejudicial Effect of Improper Failure to Exclude From Courtroom or to Sequester or Separate State’s Witnesses in Criminal Case, 74 A.L.R.4th 705 (1989); J.A. Bock, *787 Effect of Witness’ Violation of Order of Exclusion, 14 A.L.R.3d 16 (1967)..
There is no indication that Wiggins was prejudiced by the circuit court’s failure to grant his untimely motion to invoke the witness-sequestration rule. Accordingly, Wiggins is due no relief on this claim.
V.
Wiggins next argues that the circuit court erred in denying his Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), motion because, he says, the State used its peremptory strikes in a racially discriminatory manner.
In Batson, the United States Supreme Court held that it was a violation of the Equal Protection Clause to strike a black prospective juror from a black defendant’s jury based solely on the juror’s race. The Supreme Court has extended that holding to protect white defendants, Powers v. Ohio, 499 U.S. 400, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991); to prevent gender-based discrimination, J.E.B. v. Alabama, 511 U.S. 127, 114 S.Ct. 1419, 128 L.Ed.2d 89 (1994); and to apply to defense counsel as well as the prosecutor, Georgia v. McCollum, 505 U.S. 42,112 S.Ct. 2348, 120 L.Ed.2d 33 (1992).
The record shows that before striking the jury and after voir dire examination the circuit court informed the prosecutor that he would need to provide his reasons for striking the black prospective jurors. (R. 705.)
“Here, the trial court did not make an express finding "that Martin had established a prima facie case of racial discrimination. Rather, before the striking of the jury even began, the trial court instructed both parties to state the reasons for each strike as the strikes were made. Therefore, we have no choice but
to presume that a prima facie case of discrimination was established, and we will evaluate the prosecutor’s reasons — ”
Martin v. State, 62 So.3d 1050, 1058 (Ala. Crim.App.2010).
The prosecutor gave the following reasons when striking the black prospective jurors:
“[Prosecutor]: Number 232 is my first strike, and it is a black male [L.T.[7]] who .-indicated on hi§ questionnaire that he was strongly opposed to the death penalty.
[[Image here]]
“[Prosecutor]: . Juror 96, our third strike. It’s a black male who indicated on his juror questionnaire that he would never vote to impose the death penalty.
[[Image here]]
“[Prosecutor]: Number 100 who is a black male who indicated on his juror questionnaire that the State of Alabama should not be allowed to use the death penalty, as a form of punishment.
“[Defense counsel]: The only question I would have, Your Honor, is whether or not there were any other white jurors that have indicated they do not feel like the State would be able to use the death penalty.
“[Prosecutor]: Not that I remember, no. If there are, I will strike them.
[[Image here]]
“[Prosecutor]: Number 207 who is a black female who indicated during questioning this morning that she would not want to vote for the death penalty, that she would prefer'life without parole over the death penalty as a sentence that she would vote on. She stated as a direct quote, T don’t want a death" to be on my hands.’

*788
(í

“[Prosecutor]: Number 165 who is a black male who indicated this morning— or it may have been yesterday, I think it might have been this morning prefer to impose life without parole over the death penalty, and he also indicated that he had hired [defense counsel] to represent him in the past on some kind of weapons charge.
[[Image here]]
“[Prosecutor]: Number 169, a black female who indicated in questioning this morning that she, like the last juror, prefers the sentence of life without parole over the death penalty. She said that — at one point she had said she could not consider the death penalty, then changed that to say that she could. And she, quote, said, ‘[Killing [Wiggins] would not bring the victim back.’

a

“[Prosecutor]: 173 is a black female who, like the last juror, stated that she preferred — would prefer to impose life without parole over the death penalty as a sentence.
[[Image here]]
“[Prosecutor]: Number 31 who indicated in her questioning yesterday, I believe, that she would probably pick life without parole over the death penalty. And in her questionnaire, she specifically said, quote, ‘I don’t want to participate in a murder trial’
[[Image here]]
“[Prosecutor]: Number 50 is a black female who indicated on her juror questionnaire that she did not, quote, ‘want to participate in a murder case.’ And she stated yesterday during questioning, I think by [defense counsel] that she said the death penalty is ugly. It is not good.’
[[Image here]]
“[Prosecutor]: Number 41, a black female who indicated on her questionnaire that her brother is [W.J.]. [W.J.] is a defendant that I myself prosecuted a few years back for a murder which occurred in Hurtsboro at the Green Leaf Club. He was convicted of manslaughter.
[[Image here]]
“[Prosecutor]: Juror number 83 is a black female who indicated in questioning today, I believe, and also on her questionnaire that her brother has very recently been charged with robbery, and I think she indicated that it dealt with drugs as well and that his charges are still pending. She also indicated that our office has prosecuted her for worthless checks as well.
[[Image here]]
“[Prosecutor]: Number 11 who is a black male who indicated on his questionnaire that he has a misdemeanor conviction for DUI [driving under the influence],
[[Image here]]
“[Defense counsel]: We would object to this one, Your Honor, based on the fact that there are other white people that have had DUIs also and they were not struck first. They were struck — hadn’t been struck yet.
“The Court: I’ll reserve ruling on that to see what the ultimate composition of the jury is. If I determine that it is unfair or disproportionate amount that have been taken, I’ll adjust it.
[[Image here]]
“[Prosecutor]: Juror number 76 is a white male. Keeping with my last strike, he is the next person on the list who indicated he has a misdemeanor conviction for DUI on his juror questionnaire.
[[Image here]]
*789 “[Prosecutor]: 203 is a white male who indicated he had been charged with a misdemeanor on his questionnaire. This one was for harassment.
[[Image here]]
“[Defense counsel]: The only challenge that we would have, Your Honor, is that the State used a disproportionate number of their strikes to strike black individuals, and the only one that was in question that the Court was going to reserve a ruling on was one regarding a marijuana charge. And I believe—
“[Prosecutor]: DUI.
“[Defense counsel]: DUI, I’m sorry, misdemeanor anyway. And [the prosecutor] indicated he was going to strike the next white one that had that, but got rid of all but two out of one, two, three, four,—
“[Prosecutor]: 14.
“[Defense counsel]: — five, six. And out of 14, there were 12 strikes of blacks.
“[Prosecutor]: Judge, the first juror I struck with the misdemeanor charge was a black male. There were only four. The next three that I struck were all white, and they were struck for that reason.
“The Court: That was juror number 11?
“[Prosecutor]: Yes, sir.
“The Court: Who was the State’s alternate in that?
“[Prosecutor]: 156.
“The Court: I’m going to restore juror number 11 back to the first 12 and allow the State to take another strike, and you can move either 156 — let’s see how we can do that. Yeah, you’ll have to take out one of the remaining jurors, but you can have that juror or 156 as an alternate.
“[Prosecutor]: I can have 11 or 156 as the alternate?
“The Court: No, 11 will be back on the jury. That will give you 156 or whoever else you strike.
“[Prosecutor]: I see, okay. The only reason I would have to strike any other juror is, Judge, there are two jurors left who had been absent parent or who had been prosecuted by our office for child support. That would be juror number 65 and juror number 203. And number 203 I’ve already taken, so the only available one would be number 65, so that would be my strike.
“The Court: Okay. And who is that?
“[Prosecutor]: Juror number 65.
“[Defense counsel]: Another black male.
“The Court: No, it would have to be a white juror you’ll have to remove.
“[Prosecutor]: 161.
“The Court: All right. Do you want 156 or 161 as your alternate?
“[Prosecutor]: 156 as the alternate.
“The Court: That’s the first alternate. If one of the first 12 for some reason should be removed, then 156 would be the first juror moved into the place of one of the first 12.”
(R. 705-13.),
On appeal, Wiggins argues that the prosecutor did not treat black jurors and white jurors the same and struck black jurors for reasons that also applied to white jurors who were not struck. In evaluating claims of disparate treatment, we keep in mind the following:
“While disparate treatment is strong evidence of discriminatory intent, it is not necessarily dispositive of discriminatory treatment. Lynch [v. State ], 877 So.2d [1254] at 1274 [ (Miss.2004) ] (citing Berry v. State, 802 So.2d 1033, 1039 (Miss. 2001)); see also Chamberlin v. State, 55 So.3d 1046, 1050-51 (Miss.2011). Where multiple reasons lead to a peremptory strike, the fact that other ju-
*790 rors may have some 'of the individual characteristics of the challenged juror does not demonstrate that the reasons assigned are pretextual.’ Lynch, 877 So.2d at 1274 (quoting Berry, 802. So.2d at 1040).” .. .
Hughes v. State, 90 So.3d 613, 626 (Miss. 2012).
“‘Disparate treatment,’ as such, cannot automatically be imputed in every situation where one of the State’s reasons for striking-a venireperson would technically apply to another venireper-son -whom the State found acceptable. See United States v. Lewis, 837 F.2d 416 (9th Cir.198[8]); McHenry v. State, 823 S.W.2d 667 (Tex.App.-Dallas 1991).. The decision to strike a particular venireper-son is not susceptible to rigid quantification; rather, it is a fluid process, often hinging 'on the interaction of a number of variables and permutations.”
Cantu v. State, 842 S.W.2d 667, 689 (Tex. Crim.App.1992).
“As recently noted by the Court of Criminar Appeals, ‘disparate treatment’ cannot automatically be imputed in every situation where one of the State’s bases for striking a venireperson would technically apply to another venireper-son whom the -State found acceptable; .Cantu v. State, 842 S.W.2d 667, 689 (Tex.Crim.App.1992). The State’s use of -its peremptory challenges is not subject to rigid quantification. Id, Potential jurors. may.possess the same objectionable characteristics, yet in varying degrees. Id, The fact that jurors remaining on the panel , possess one of more of the same characteristics as a juror that was stricken, does not establish disparate treatment.”
Barnes v. State, 855 S.W.2d 173, 174 (Tex. App.1993).
“[W]e must also look to the entire record to determine if, despite a similarity, there-are any significant differences between the characteristics and responses of the veniremembers that would, under the facts of this case, justify the prosecutor treating them differently as potential members of the jury. See Miller-El [v. Dretke ], 545 U.S. [231] at 247, 125 S.Ct. [2317] at 2329 [ (2005) ].”
Leadon v. State, 332 S.W.3d 600, 612 (Tex. App.2010).
“Potential jurors may possess the same objectionable characteristics, but in varying degrees. Additionally, prospective jurors may share a negative feature, but that feature may be- outweighed' by characteristics that are favorable-from the State’s perspective. Such distinctions may not another.”
Johnson v. State, 959 S.W.2d 284, 292 (Tex.App.1997). “This Court has recognized that for disparate treatment’to exist, the persons being compared must be ‘otherwise similarly situated.’ ” Sharp v. State, 151 So.3d 342, 367 (Ala.Crim.App. 2013) (on-rehearing).
“The prosecutor’s failure to 'strike similarly situated jurors- is not pretextual ... ‘where ■ there are relevant "differences between the struck jurors and the comparator jurors.’ United States v. Novaton, 271 F.3d 968, 1004 (11th Cir. 2001). The prosecutor’s explanation ‘does not demand an explanation that is persuasive, or even plausible;' so long as the reason is not inherently discriminatory, it suffices.’ Rice v. Collins, 546 U.S. 333, 338, 126 S.Ct. 969, 973-74, 163 L.Ed.2d 824 (2006) (quotation marks-and citation omitted).”"
Parker v. Allen, 565 F.3d 1258, 1271 (11th Cir .2009).
Wiggins specifically argues that two black jurors were struck because they had relatives with prior criminal convic *791 tions; however, he says, three white jurors who also had relatives with prior criminal convictions were not struck.- Juror A.C., a black female, was struck because, the prosecutor said, the district attorney’s office had recently prosecuted1 her brother and had obtained a conviction for manslaughter. Strikes based on prior criminal convictions of the vertiremember’s family members have been upheld as nonviolative of Batson. Blackmon v. State, 7 So.3d 397, 414 (Ala.Crim.App.2005). Juror J.F. had a brother with drug charges pending against him. The prosecutor did not strike Juror J.F. solely because of her brother, however; Juror J.F. had been prosecuted for negotiating worthless checks. Striking a juror based on their criminal activity is a reason that does not violate Batson. See Stephens v. State, 580 So.2d 11 (Ala.Crim.App.1990).
Wiggins argues that three white jurors, L.A., T.S., and M.B., were not struck although they had relatives who had criminal convictions. Juror L.A. said that her husband was a convicted sex offender and that her son had been placed, on probation for burglary. Juror T.S, said that her daughter had been prosecuted for assault and that her brother had been convicted of burglary. Juror M.B. stated on his juror questionnaire that his nephew had been convicted of a controlled substance crime and had been placed on probation.
First, these jurors were not; similarly situated;-to the two black jurors A.C. and J.F. Having a sibling convicted of manslaughter, as did Juror A.C., is not the equivalent of having a family member convicted of an offense,- not involving murder — the same offense at issue in the present case. Also, the other challenged black juror who was struck, Juror J.F., was not struck solely because of her sibling’s pending drug charges but because Juror J.F. had a conviction. Moreover, both Juror L.A. and Juror T.S., the white jurors challenged on appeal because they -were not struck by the prosecutor, responded on their juror questionnaires that they were strongly in favor of the death penalty and that the State should have the right to impose the> death penalty. Juror -M.B., a white juror Wiggins challenges in his brief, responded on his juror questionnaire that he had been trained as a police officer, that he was moderately in favor or the death -penalty, and that the State should have the right to impose the death penalty. However, Juror A.C. responded-on her juror questionnaire that she was moderately in favor of the death penalty and that she was not sure if the State should be allowed to impose death as a punishment. The two struck black jurors were not similarly situated to the three white jurors who were not struck.
Wiggins further asserts that the prosecutor failed to strike Juror M.M. a white.male,.whose brother had been convicted of theft. However, Juror M.M. was an alternate juror. “For purposes of Bat-son we view the alternate jurors as having been struck.” Ex parte Bankhead, 625 So.2d 1146, 1147 (Ala.1993). Because Juror M.M., was essentially struck for purposes of this Batson claim there is no issue for this Court to consider regarding Juror M.M.
Wiggins next argues that the prosecutor struck Juror J.A., a black male, for having a conviction for driving under the influence but failed to', strike Juror T.S., a white juror, for the same reason. However, as quoted above, the record shows .that Juror J.A. was restored to the venire. We have held that a proper means of handling a Batson objection is to restore the challenged juror to the venire. O’Neal v. State, 602 So.2d 462, 465 (Ala.Crim.App. 1992);
*792 Last, Wiggins asserts that the prosecutor struck black jurors who were opposed to the death penalty before striking a white juror, M.M., who was opposed to the death penalty and who he says would vote for life imprisonment in some circumstances.[8] However, Juror M.M. never indicated that he was opposed to the death penalty. In fact, on his juror questionnaire he indicated that he was “strongly in favor” of the death penalty. Nor did Juror 1VLM. indicate on voir dire that he would recommend a sentence of life imprisonment without parole to a person who had committed a murder while on drugs. When questioned by the court Juror M.M. indicated that he could follow the law and be fair. (R. 498-99.) Wiggins’s claim is not supported by the record..
“ ‘When reviewing a trial court’s ruling on a Batson motion, this court gives deference to the trial court and will reverse a trial court’s decision only if the ruling is clearly erroneous.’ Yancey v. State, 813 So.2d 1, 3 (Ala.Crim.App. 2001). ‘A trial court is in a far better position than a reviewing court to rule on issues of credibility.’ Woods v. State, 789 So.2d 896, 915 (Ala.Crim.App.1999). ‘Great confidence is placed in our trial judges in the selection of juries. Because they deal on a daily basis with the attorneys in their respective counties, they are better able to determine whether discriminatory.patterns exist in the selection of juries.’ Parker v. State, 571 So.2d 381, 384 (Ala.Crim.App.1990).”
Doster v. State, 72 So.3d 50, 73-74 (Ala. Crim.App.2010). “Deference to trial court findings on the issue of discriminatory intent makes particular sense in this context because, as we noted in Batson, the finding ‘largely will turn on evaluation of credibility.’” Hernandez v. New York, 500 U.S. 352, 365, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991).
Affording the circuit court’s Batson ruling the deference that we must, we cannot say that the circuit court’s ruling was clearly erroneous; therefore, Wiggins is due no relief on this claim.

VI.

Wiggins next argues that the circuit court erred in allowing hearsay testimony to be admitted during Bryan McGin-nis’s testimony.
The record shows that on direct examination McGinnis testified that when he left the shop for the day he left his rifle inside the shop and he did not know if Wiggins knew that the rifle had been left at the shop. On redirect examination, McGinnis testified that he did remember telling investigators that Wiggins saw him leave the rifle at the shop. (R. 791.) Wiggins did not object to the admission of this testimony; therefore, we review this claim for plain error. See Rule 45A, Ala. R.App. P.
Wiggins asserts that McGinnis’s statement concerning what he told the investigator was inadmissible hearsay. “Hearsay” is defined in Rule 801(c), Ala. R. Evid., as “a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted.”
However, Rule 801(d), Ala. R. Evid., specifically provides that a prior statement by a witness is not hearsay if the statement is inconsistent with the declarant’s testimony and the declarant is subject to cross-examination.
“ ‘Prior inconsistent statements of a witness made out of court are admissible in evidence for the purpose of showing that the witness is not worthy of belief — that is, for impeachment *793 purposes. Such evidence is not classed as hearsay.
“29 Am.Jur.2d Evidence, § 500 (1967). ... See also McElroy’s Alabama Evidence, supra, at § 149.01(10). This type statement is not offered to prove the truth of the things said, and so does not fit the definition of hearsay.”
Jones v. State, 531 So.2d 1251, 1254 (Ala. Crim.App.1988). Pursuant to Rule 801(d), Ala. R. Evid., the challenged testimony was, by definition, not hearsay.
Moreover, even if the statement was hearsay, any error in its admittance was harmless beyond a reasonable doubt. “This Court has repeatedly held that ‘[a]ny error in the admission of hearsay testimony [is] harmless beyond a reasonable doubt when the testimony is cumulative to other lawfully admitted testimony.’ ” White v. State, 179 So.3d 170, 216 (Ala. Crim.App.2013), quoting Belisle v. State, 11 So.3d 256, 299 (Ala.Crim.App.2007).
Wiggins testified in his own defense and made a statement to police. Wiggins said in his statement — a statement that this Court held in Part III of this opinion was properly admitted — that McGinnis told him that he had left the rifle at the shop. Wiggins’s trial testimony also showed that he knew that McGinnis had left his rifle at the shop and that he shot Cavins with that rifle. Thus, any conceivable error in the admission of McGinnis’s testimony was harmless beyond a reasonable doubt. See Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967)(noting that constitutional error may be harmless if a reviewing court can say that the error was harmless beyond a reasonable doubt). For these reasons, Wiggins is due no relief on this claim.
VII.
Wiggins next argues that the prosecutor improperly raised victim-impact evidence at the guilt phase and that evidence prejudiced him. Specifically, he argues that the prosecutor elicited the following testimony from the victim’s widow — that the victim was survived by his mother and a daughter and that the victim’s mother was sitting in the courtroom — and that the victim’s widow improperly identified the victim’s mother during her testimony.
Connie Cavins, the victim’s widow, testified at the guilt phase of the trial. She said that she and the victim had been married for 13 years at the time he died, that his mother was still living, and that he had one daughter. She also identified the victim’s mother, who was present in the courtroom, to the jury. (R. 1065.) Wiggins did not object to this testimony; therefore, we review this claim for plain error. See Rule 45A, Ala. R.App. P.
The Alabama Supreme Court in Ex parte Rieber, 663 So.2d 999 (Ala.1995), upheld the admission of similar victim-impact evidence at the guilt phase of a capital-murder trial. The court stated:
“It is presumed that jurors do not leave their common sense at the courthouse door. It would elevate form over substance for us to hold, based on the record before us, that Rieber did not receive a fair trial simply because the jurors were told what they probably had already suspected — that [the victim] was not a ‘human island,’ but a unique individual whose murder had inevitably had a profound impact on [his] children, spouse, parents, friends, or dependents (paraphrasing a portion of Justice Souter’s opinion concurring in the judgment in Payne v. Tennessee, *794 501 U.S. 808, 838, 111 S.Ct. 2597, 115 L.Ed.2d 720. (1991)).”
663 So.2d at 1005-06.
Many other courts have likewise found no reversible error in' the admission of limited victim impact evidence in the .guilt phase of a capital murder trial. See Commonwealth v. Jordan, 65 A.3d 318 (Pa. 2013); State v. Jackson, 410 S.W.3d 204 (Mo.Ct.App.2013); Moore v. Mitchell, 708 F.3d 760, 805 (6th Cir.2013); Schreibvogel v. State, 228 P.3d 874 (Wy.2010); State v. Ott, 247 P.3d 344 (Utah 2010); Goff v. State, 14 So.3d 625 (Miss.2009); State v. Hale, 119 Ohio St.3d 118, 892 N.E.2d 864 (2008); Coulthard v. Commonwealth, 230 S.W.3d 572 (Ky.2007); Dodd v. State, 100 P.3d 1017 (Okla.Crim.App.2004).
The victim-impact evidence that was admitted in the guilt phase in this case did not constitute plain error. See Ex parte Rieber, supra.. For these reasons, Wiggins is due no relief on this claim.
VIII.
Wiggins next argues that admission of evidence of his prior convictions violated his- rights under state and federal law., Specifically, -he argues that it was reversible error for the prosecutor to cross-examine Wiggins’s mother, Nancy Wadlington, concerning Wiggins’s prior conviction in the State of Georgia for robbery.
The record shows that Wad-lington-testified on her son’s behalf in -the guilt phase. On direct examination, Wad-lington said that Wiggins had had problems with drugs and alcohol for years and that when Wiggins was young he was frequently suspended from school. On, cross-examination, the following occurred:
“[Prosecutor]: Well, there was a time when [Wiggins] was in the penitentiary in Georgia for robbery; is that correct?
“[Wadlington]: That’s right.
“[Prosecutor]: He didn’t live with you then, did he?
“[Wadlington]: No, that’s why I said off and on.
“[Prosecutor]: In fact, he was in the penitentiary for more than three years for robbery in Georgia, wasn’t he, where he held a gun on a man over there and took his car? -
“[Wadlington]: Yes, That’s what they said.”
(R. 1087-88.) Wiggins did not object to this line of cross-examination; therefore, we review, this claim for plain error. See Rule 45A, Ala. R.App. P.
. “The appellant cannot complain about exploration of an issue which the appellant injected into trial. Morgan v. State, 440 So.2d 1240 (Ala.Cr.App.1983). ‘Where a matter has been gone into by one party to a cause, the other party has the right to explain away anything, if he can, that may have been brought out to his detriment.’ Wyrick v. State, 409 So.2d 969, 975 (Ala.Cr.App.1981), cert. denied, 409 So.2d 969 (Ala.1982). A defendant is not permitted to present evidence to the jury on a specific issue and object when the state attempts to introduce evidence on the same point. Billingsley v. State, 402 So.2d 1052 (Ala.Cr. App.1980), rev’d on other grounds, 402 So.2d 1060 (Ala.1981), cert. denied, 465 U.S. 1023, 104 S.Ct. 1276, 79 L.Ed.2d 681 (1984).”
Morgan v. State, 589 So.2d 1315, 1320-21 (Ala.Crim.App.1991).
“The defendant, himself, injected evidence of the prior rape conviction and, subsequently, volunteered information that the victim’s consent was an issue in the prior case. Because the victim’s consent was the only issue in this case, the evidence of the prior rape was ad *795 missible, under an exception to the general exclusionary rule, to prove the defendant’s criminal intent or motive, or the nonconsent of the victim. Chancellor v. State, 38 Ala.App. 89, 80 So.2d 313, cert. denied, 262 Ala. 700, 80 So.2d 316 (1964); O’Berry v. State, 361 So.2d 1132 (Ala.Cr.App.), cert. denied, 361 So.2d 1135 (Ala.1978); Cofer v. State, 440 So.2d 1116 (Ala.Cr.App.1983); C. Gamble, McElroy’s Alabama Evidence, Section 70.01(22)(d) (3rd ed.1977).”
Oglen v. State, 440 So.2d 1172, 1176 (Ala. Crim.App.1983). On direct examination, Wiggins opened the door to the prosecutor’s cross-examination of Wadlington about Wiggins’s prior conviction for robbery in the State of Georgia.
More importantly, even if Wiggins failed to open the door to this line of questioning any conceivable error was harmless. “Testimony which may be apparently illegal upon admission may be rendered prejudicially innocuous by subsequent or prior lawful testimony to the same effect or from which the same facts can be inferred.” Thompson v. State, 527 So.2d 777, 780 (Ala.Crim.App.1988). “The erroneous admission of evidence that is merely cumulative is harmless error.” Dawson v. State, 675 So.2d 897, 900 (Ala. Crim.App.1995). The harmless-error rule applies to the admission of Rule 404(b), Ala. R. Evid., evidence. As we stated in Hunter v. State, 802 So.2d 265 (Ala.Crim. App.2000):
“ ‘Whether the improper admission of evidence of collateral bad acts amounts to prejudicial error or harmless error must be decided on the facts of the particular case.’ R.D.H. v. State, 775 So.2d 248, 254 (Ala.Crim.App.1997); Hobbs v. State, 669 So.2d 1030 (Ala.
Crim.App.1995). The standard for determining whether error is harmless is whether the evidence in error was ‘harmless beyond a reasonable doubt.’ Schaut v. State, 551 So.2d 1135, 1137 (Ala.Crim.App.1989), citing Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).”
802 So.2d at 270. See also United States v. Moncayo, 440 Fed.Appx. 647, 652 (10th Cir.2011) (“[T]his court will ‘not disturb a jury verdict based on a Rule 404(b) error if it was harmless.’ ”) (not selected for, publication in the Federal Reporter);[9] United States v. Knope, 655 F.3d 647, 657 (7th Cir.2011) (“Wé will reverse' for error in admitting Rule 404(b) evidence only if the error was not harmless.”); United States v. McCall, 553 F.3d 821, 827 (5th Cir.2008) (“[Ejrroneous admissions under ■ Rule 404(b) are subject to a harmless error inquiry.”);
Wiggins testified in his own defense, and the following occurred during his direct examination:
“[Defense counsel]: You’re not here today to say that you didn’t kill Kyle Cavins, are you?
“[Wiggins]: No, I think that’s obvious.
“[Defense counsel]: You’re not here to say that Jeremy Johnson killed Kyle Cavins, are you?
“[Wiggins]: No.
“[Defense Counsel]: You did all that, didn’t you?
“[Wiggins]: Yeah, that’s correct.
“[Defense counsel]: Have you ever been arrested before?
“[Wiggins]: I have.
“[Defense counsel]: How many times would you say you’ve been arrested?
*796 “[Wiggins]: Several. I mean, if you give me a minute, I’ll think and tell you exactly. I think five in all.
“[Defense counsel]: Got a conviction over in Georgia?
“[Wiggins]: That’s right.
“[Defense counsel]: Spent how much time in prison?
“[Wiggins]: I think I did 35 months on a 36-month sentence. I was sentenced 10 years, to serve three.
“[Defense counsel]: And what was that for?
“[Wiggins]: Robbery.
“[Defense counsel]: What kind?
“[Wiggins]: I had robbed a man of his truck. I mean, we were sitting at that Spectrum [gasoline station]. If you will, I’ll give you a few details about it. We have been out partying and whatnot over on Victory Drive and drinking a lot. I hooked up with this female that I knew. She had some cocaine. We snorted a bunch of cocaine and whatnot, but then we were headed home. We was coming- back with a friend. My truck was parked at the Red Barn over in Phenix City. We had rode to the bar with some friends and then as were leaving, he jumps me and blows out a tire, and I tripping because I know the police are probably going to be coming because, like I said, it was right there on Victory Drive. So me and a good friend of mine, Brad, we took off walking because I didn’t want to be seen at this little scene, so, anyway, we went — it was in January. It was cold. We went to the Spectrum across from the Kick-N-Chicken and we were kind of like ducked out behind the dumpsters back there.
“[Defense counsel]: Well, just—
“[Wiggins]: A guy pulls up,
“[Defense counsel]: — what happened?
“[Wiggins]: Well, I’m fixing to tell you. A guy pulls up, and we were cold because we have been sitting out there, and he was out there pumping gas, and I went up to him and I told him let me have your truck, and he give me his truck because, you know, I mean, I was looking for a way home or back to my truck which didn’t make any sense because we both had money. We could have took a cab.
“[Defense counsel]: Did you have a gun?
“[Wiggins]: No.
“[Defense counsel]: Did you get convicted of anything in Washington State?
“[Wiggins]: I did.
“[Defense counsel]: What was that?
“[Wiggins]: An attempted robbery, I think, was the actual charge, attempted robbery.
“[Defense counsel]: How much time did you get there?
“[Wiggins]: I was just — only time I was in jail there was waiting extradition. I don’t think they — I think what they did is give me like three months, and I was waiting extradition to get back to Columbus on the charges that we just spoke of.
“[Defense counsel]: Have you at any time ever been arrested and incarcerated for anything you’ve done when you were not on drugs or alcohol?
“[Wiggins]: No, sir.
“[Defense counsel]: That’s all I have.
“[Wiggins]: Wait, I’m sorry, my bad. There was one time in Meriwether County, this was a misdemeanor charge, my kids’ mother’s nephew had rented some movies at a movie store that was in my name and he didn’t turn them back in, and they charged me with theft by taking or theft of property or something like that. It was a misdemeanor because he didn’t turn the movies back *797 in, but because they was in my name, I got charged for it. I got like some probation for it.”
(R. 1130-33.)
Wiggins’s defense, in part, was that he had committed robbery in the past and had not killed the person; therefore, he argued he lacked the intent to kill Cavins. As evidenced above, Wiggins’s prior convictions were introduced, in-depth, during Wiggins’s direct testimony and were offered as substantive evidence on the issue of intent. Therefore, any possible error in the question asked of Wadlington about Wiggins’s prior robbery conviction was harmless beyond a reasonable doubt given Wiggins’s extensive direct testimony concerning his prior convictions. See Chapman v. California, supra.
In this section of Wiggins’s brief, Wiggins further argues that the circuit court erred in failing to give a limiting instruction on the proper use of his prior convictions. The circuit court gave the following instruction:
“The jury has heard evidence of [Wiggins’s] conviction of other crimes. The fact that [Wiggins] has been previously convicted of other offenses gives rise to no inference that he is guilty of the present offenses with which he is charged.”
(R. 1215-16.)
The Alabama Supreme Court has recognized that no limiting instruction is necessary when the prior convictions were introduced as substantive evidence instead of for impeachment purposes. The Supreme Court stated:
“It is contradictory and inconsistent to allow, on the one hand, evidence of Johnson’s prior bigamy conviction and prior bad acts as substantive evidence of the offense with which she was charged, yet, on the other hand, to require a limiting instruction instructing the jury that it cannot consider the evidence as substantive evidence that Johnson committed the charged offense.”
Johnson v. State, 120 So.3d 1119, 1129 (Ala.2006). Based on the Supreme Court’s holding in Johnson, we find no plain error in the circuit court’s failure to give a more detailed limiting instruction in this case. Accordingly, Wiggins is due no relief on this claim.
IX.
Wiggins next argues that the circuit court erred in allowing the lead investigator to testify to the ultimate issue of intent. Specifically, he argues that the circuit court erred in allowing Lt. Heath Taylor, an investigator with the Russell County Sheriffs Department, to testify that Wiggins loaded the rifle and that the case was a capital-murder ease. Wiggins makes two arguments concerning Lt. Taylor’s testimony.
A.
First, Wiggins argues that it was error to allow Lt. Taylor to testify to the ultimate issue — whether Wiggins had the intent to kill.
The record shows that during cross-examination, defense counsel questioned Lt. Taylor extensively about his experience with persons who were intoxicated or on drugs and the effects those substances had on the user and their actions. The following then occurred on redirect examination by the prosecutor:
“[Prosecutor]: [Defense counsel] was asking you about the fact that people who are on narcotics, I think the point he was trying to make to you is that they don’t clearly think or they’re in some way impaired when they’re on narcotics. You remember him asking you that line of questioning; correct?
*798 “[Lt; Taylor]: I do.
“[Prosecutor]: Prom the'testimony or 'from the statement' that Mr, Wiggins gave you there at your office, isn’t it true, Lieutenant Taylor, that Mr. Wiggins was able to- drive that white Cáma-ro from wherever he had been before Mr. Cavins was killed, drive' it safely to that shop and park it?
“[Lt. Taylor]: Absolutely.

((

“[Prosecutor]: The fact that there was a box of ammunition. there in the paint booth next to that truck where [Wiggins] told you he had shot Mr. Cavins, initially?
“[Lt. Taylor]: Yes, sir.
“[Prosecutor]: Were there live rounds in that box?
“[Lt. Taylor]: There were.
“[Prosecutor]: Missing rounds?
“[Lt. Taylor]: There were.
“[Prosecutor]: That tells you that they were placed in this weapon?
“[Lt. Taylor]: They were.
[[Image here]]
“[Prosecutor]: So he loaded this weapon?
“[Defense counsel]: Objection, Your Honor. There’s no testimony that he loaded the weapon.
“[Prosecutor]: The evidence leads you [to] believe that he did?
“[Lt. Taylor]: Yes.
“[Prosecutor]: And what is that based on?
“[Lt. Taylor]: Based on—
“[Defense counsel]: • Your Honor, I would object to him stating what he bases it on because he was not there, there’s no evidence that [Wiggins] told him he loaded it, and anything that he says will be guessing.
“[The Court]: ' Well, if he observed anything, I’ll allow him to — that would lead to that conclusion, I’ll allow you to ask him that.
“[Prosecutor]: Was there anything that would lead you to that conclusion that yomyourself observed?
“[Lt. Taylor]: There is.
“[Prosecutor]: What?
“[Lt. Taylor]: The box had five or six empty spaces where there were a full box, there were several missing, and I believe that he loaded those missing rounds into the rifle. _
[[Image here]]
“[Prosecutor]: And would you expect someone who was intoxicated or hopped up on dope to be able to be that precise?
[[Image here]]
“[Defense counsel]: Your Honor, unless he’s an expert in weapons, we would object to—
“[Prosecutor]: Judge, he asked the same kind of question just a minute ago.
“[Defense counsel]: Didn’t ask if he could shoot a gun, though, Judge.
“[Prosecutor]: You asked if—
“The Court: Well, you asked him his opinion about whether a person not on drugs was less likely to shoot somebody than somebody on drugs was the effect of your question.
“[Defense counsel]: Yes, sir, but not their ability.
“The Court: Well, ability would be assumed in your question. If you want, to stipulate that he’s not qualified to answer Mr. Smith’s question, then it also would be .the same for your question, too; would it not?-
“[Defense counsel]: No, sir, it wouldn’t.
*799 “The Court: Well, you’ve asked him about his ability to judge people based upon their ability to do and act based upon while under substance abuse. He’s answered a question, and I’m going to allow the State to ask- him questions about that particular incident.
“[Prosecutor]: You can answer—
“[Defense counsel]: Exception. Your Honor.
“The Court: You’ve opened the issue for him to go into it.
“[Defense counsel]: Exception,, Your Honor.
“[Prosecutor]: You can answer the question.
“[Lt. Taylor]: I think it would take someone that had some knowledge and some ability to load the weapon and fire from a distance of that first round, striking the individual all three times, to have some means of ability to thought and process thoughts.
“[Prosecutor]: Clarity of thought.
“[Lt. Taylor]: Clarity of thought.”
(R. 870-78.)
Wiggins asserts that the circuit court erred in allowing Lt. Taylor to testify to the ultimate fact in issue. Rule 704, Ala. R. Evid., provides: “Testimony in the form of an opinion or inference otherwise admissible is to be excluded if it embraces an ultimate issue to be decided by the trier of fact.” “An ultimate issue has been defined as the last question that must be determined by the jury.” Tims v. State, 711 So.2d 1118, 1125 (Ala.Crim.App.1997). The ultimate issue was not whether Wiggins had clarity of thought when he loaded the rifle but whether Wiggins was guilty of intentionally killing Cávihs during the course of a robbery.'
Also, the challenged testimony occurred on redirect examination.
“ ‘The purpose of redirect examination is “to answer any matters brought out on the cross-examination of the witness by [the] adversary.”’ Sistrunk v. State, 596 So.2d 644, 647 (Ala.Crim.App.1992). ‘The prosecution was entitled, on redirect, to further explore matters, elicited during cross-examination by defense' counsel.’ Mangione v. State, 740 So.2d 444, 455 (Ala.Crim.App.1998).”
Scott v. State, 168 So.3d 389, 439 (Ala. Crim.App,2012). “Courts have discretion to allow an ordinarily inadmissible inquiry when an adversary ‘opens the door’ to that line of inquiry.” State v. Buchholtz, 841 N.W.2d 449, 454 (S.D.2013). “A party who has brought out evidenc'd on a certain subject has no valid complaint as to the trial court’s action in allowing his opponent or adversary to introduce evidence on the same subject.” Brown v. State, 392 So.2d 1248, 1260 (Ala.Crim.App.1980).
We agree with the circuit court that Wiggins opened the door to this line of questioning. Also, the dialogue betwéen the circuit court and the attorneys shows that the court relied on Rule 701, Ala. R. Evid., in finding Lt. Taylor’s testimony admissible. Rule 701, Ala. R. Evid., provides:
“If the witness is not testifying as an expert, the witness’s testimony in the form of an opinion or inference is limited to those opinions-or inferences which are (a) rationally based .on the perception of the witness and (b) helpful to a clear understanding of the witness’s testimony or the determination of a fact in issue.”
In Wiggins’s statement to Lt. Taylor, the following occurred: =
“Lt. Taylor: When you went inside and got the rifle earlier, was there a box of shells inside?
“Wiggins:. Uh-huh.,
*800 “Lt. Taylor: You got those boxes of shells?
“Wiggins: Uh-huh. I took them out with me.
“Lt. Taylor: Took them out to the bay?
“Wiggins: Uh-huh.
“Lt. Taylor: How many shells did you put in the rifle? Do you remember that?
“Wiggins: No.
“Lt. Taylor: Do you think you loaded it to its max?
“Wiggins: I don’t even know what the gun holds, really. It’s not my gun.”
(Transcribed statement, p. 24.) Wiggins also testified at trial that he took the gun and ammunition to the deer stand behind the shop to “piddle” to see if he saw any deer. Certainly, an inference could have been drawn from Wiggins’s statement and testimony that he loaded the rifle using the ammunition that was at the shop.
For these reasons, we find no reversible error in the admission of the above testimony. Wiggins is due no relief on this claim.
B.
Second, Wiggins argues that Lt. Taylor was erroneously allowed to give his opinion that the facts of the case made the case a capital offense. Wiggins challenges the following that occurred during Lt. Taylor’s cross-examination by defense counsel:
“[Defense counsel]: Did you at any time mention anything about the death penalty to Mr. Gentry, or did he mention anything to you about it?
“[Lt. Taylor]: He did. He asked me if we were prosecuting this case as a capital murder, if we were looking as it as a capital case, and if we made, did the capital murder come along with the death penalty or did that go hand in hand, and I told him that we absolute were prosecuting this case as a capital murder case. It fit the criteria and, in fact, is a capital murder case.”
(R. 862-63.) This testimony occurred during defense counsel’s cross-examination, and counsel did not object to Lt. Taylor’s answer to his question about the death penalty. Accordingly, we review this claim for plain error. See Rule 45A, Ala. R.App. P.
If any error did occur, it was invited by Wiggins. As this Court has stated:
“ ‘Under the doctrine of invited error, a defendant cannot by his own voluntary conduct invite error and then seek to profit thereby.’ Phillips v. State, 527 So.2d 154, 156 (Ala.1988). ‘The doctrine ' of invited error applies to death-penalty cases and operates to waive any error unless the error rises to the level of plain error.’ Snyder v. State, 893 So.2d 488, 518 (Ala.Crim.App.2003).”
Robitaille v. State, 971 So.2d 43, 59 (Ala. Crim.App.2005).
Certainly, the jury was aware that Wiggins had been charged with capital murder — and that Wiggins could face the death penalty. There was no plain error in the above testimony. Wiggins is due no relief on this claim.
X.
Wiggins next argues that the circuit court erred in precluding him from presenting the expert testimony of JoAnne Terrell — a psychiatric social worker — during the guilt phase.[10] Specifically, he argues that her testimony was critical to show the effects of severe drug use and alcohol use on a person’s behavior and that this testimony would have shown that he *801 did not have the intent to kill when he shot Cavins.
The record shows that Wiggins moved that Terrell be qualified as an expert on Wiggins’s ability to form the intent to kill. On voir dire, Terrell testified that she is an instructor in the School of Social Work at the University of Alabama, that she has a Bachelor’s degree in psychology from State University of New York, that she is a licensed social worker, and that she had been qualified as an expert in substance abuse in 10 counties in Alabama. The following occurred:
“The Court: Well, she said under oath she could not testify as to the state of mind of [Wiggins] on the date in question.
“[Defense counsel]: That’s correct, but she can testify and explain several things that have been brought up by the State that they’re trying to say, well, how could he drive a car, how could he do this, how could he do that. I think she’s well qualified to be able to testify how an individual can do things like that under the influence of drugs and alcohol.
“[Prosecutor]: Not in any question, Judge. The question is at the moment he pulled the trigger on that rifle, did he know or did he have the intent to kill somebody. She can’t testify to that. I don’t know whether this lady is qualified to testify in the mitigation phase or not, but it’s clear that she has no testimony that she can render during the guilt phase of this trial that is acceptable testimony by her.
[[Image here]]
“[Prosecutor]: [Terrell] is not qualified to testify about diseases of the mind, defects of the mind. She’s not a doctor. She’s not a psychologist. She’s not qualified to testify here, and we object to it.
‘We also renew our objection to her being able to testify at all, either now or in the mitigation phase, because [Defense counsel] failed to advise us that she was going to be called. He failed to give us her report. He knew he was going to call her. He knew he was going to offer the report. Therefore, we don’t have the time to get a rebuttal expert. We object to it.
“The Court: Well, that’s another issue. I think she would be entitled to testify at the mitigation phase because that takes place at some point after the trial. Whether or not her testimony is admissible in the trial in chief is another matter. I’m going to take a recess for a few minutes and look at it.”
(R. 1155-59.) The court then sustained the State’s objection; it did not allow Terrell to testify. (R. 1159.)
Initially, we observe that other courts have found that expert testimony on the effects of alcohol is not subject to admission under Rule 702(a), Ala. R. Evid. That Rule states:
“If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise.”
(Emphasis added.)
Some courts have found that expert testimony on the effects of alcohol is not necessary because it concerns an issue within the common knowledge of a juror. As the Washington Court of Appeals stated in State v. Thomas, 123 Wash.App. 771, 98 P.3d 1258 (2004):
“A voluntary intoxication defense allows the jury to consider ‘evidence of intoxication’ to determine whether the defendant acted with the requisite intent. But unlike diminished capacity, it is not *802 necessary to present expert testimony to support an involuntary intoxication defense.. The effects of alcohol are commonly known and jurors can draw reasonable inferences from testimony about alcohol- use. State v. Kruger, 116 Wash. App. 685, 692-98, 67 P.3d 1147, rev. denied 150 Wash.2d 1024, 81 P.3d 120 (2003); State v. Smissaert, 41 Wash. App. 813, 815, 706 P.2d 647 (1985).”
123 Wash.App. at 781-82, 98 P.3d at 1263, See also State v. Frank, 364 N.W.2d 398, 400 (Minn.1985) (“Most jurors have some experience with the effects of excessive alcohol consumption and therefore, -in an ordinary case, will not need expert assistance.”).
The Arizona Supreme Court in State v. Rivera, 152 Ariz. 507, 733 P.2d 1090 (1987), stated:
“On the question of whether the trial court properly excluded expert testimony concerning the effect of intoxication on defendant’s state of mind at the time of the crime, our decision in [State v.] Hicks [, 133 Ariz. 64, 649 P.2d 267 (1982),] is directly on point. In Hicks, we reiterated that because the effect of alcohol intoxication is a subject matter within the common knowledge and-experience of the jury, the trial court properly can preclude expert testimony ‘relating to the effect of alcohol upon the ability to form specific intent.’ Hicks, 133 Ariz. at 71, 649 P.2d at. 274. Similarly, the trial court can deny admission of expert testimony on the issue of alcoholic black-outs as,it relates to specific intent. Id. Since in the present , case defendant offered expert testimony on the effect of intoxication to negate , the elements of intent and premeditation, the trial court properly excluded the .testimony.”
152 Ariz. at 514-15, 733 P.2d at 1097-98.
Moreover, this Court considered the admission of similar evidence in Wilkerspn v. State, 686 So.2d 1266 (Ala.Crim.App.1996), and found no reversible error in the circuit court’s exclusion of expert testimony concerning whether Wilkerson had the ability to form the intent to kill. We stated:
“The appellant contends that the trial court erred by not allowing him to question his expert witness, Dr. Alan Blotcky, a clinical psychologist who performed ‘ a court-ordered evaluation of the appellant, as to whether the appellant-had the ability to form the requisite intent to commit murder. During an offer of proof in the trial court, the appellant’s counsel explained that Dr. Blotcky would testify that the appellant had a diminished capacity to form the requisite intent to commit murder because of the combined effect of intoxication at the time of the crime, borderline intellectual function, and mental disease or defect (i.e,, passive-aggressive.personality). ‘It has been held traditionally in this country that an expert witness cannot give his opinion upon an ultimate issue in the, case..’ Charles W. Gamble,. McElroy’s Alabama Evidence § 127.01(5)(d),(4th ed.1991), More specifically, ‘[a] witness, be he expert or lay, cannot give his opinion when such constitutes a legal conclusion or the application of a legal definition.’ Gamble, supra, at § 128.07.
“The appellant refers us to our opinion in Bailey v. State, 574 So.2d 1001, 1003 (Ala.Cr.App.1990), where we stat-éd: ‘[T]he modern trend is in the direction of permitting experts to give their opinions upon ultimate issues, of which the final determination rests with the jury.’ The modern trend culminated in the adoption of Rule 704 of the Federal Rules of. Evidence, which abandoned the ultimate issue rule. C. Gamble, supra, at § 127.01(5)(d). However, sub *803 section (b) of Rule 704 contains the following important limitation:
“ ‘No expert witness testifying with respect to the mental state or condition of a defendant in a criminal case may state an opinion or inference as to whether the defendant did or did not have the mental state or condition constituting an element of the crime charged or of a defense thereto.’
“Stated differently,
“ ‘Rule 704(b) does not prohibit an expert witness from stating his opinion and reviewing facts from which a jury could determine whether a defendant had the requisite criminal intent. ... Rather, the rule prohibits an expert witness from testifying that a defendant did or did not possess the requisite mental intent at the time of the crime.’
“United States v. Orr, 68 F.3d 1247, 1252 (10th Cir.1995), cert. denied, 516 U.S. 1064, 116 S.Ct. 747, 133 L.Ed.2d 695 (1996). See also United States v. Frisbee, 623 F.Supp. 1217, 1222-223 (N.D.Cal.1985) (‘the defendant’s experts will hot be allowed to state an opinion or inference as to- whether the defendant did or did not form a specific intent to kill_ No testimony directly or indirectly opining ón the issue of specific intent will be allowed’). Thus, even the more permissive federal rule does not allow an expert witness to state an opinion as to the ultimate issue of whether a defendant had the requisite mental state to commit murder. Here, it is clear ■from the record that the appellant sought only to elicit Dr. Blotcky’s opinion ' on the . issue of. specific intent. Therefore, even under the modern trend, the appellant’s argument that Dr. Blotcky should have been allowed to testify concerning the appellant’s intent fails.”
686 So.2d at 1278-79.
For the foregoing reasons, we find no reversible error in the circuit court’s ruling excluding Terrell’s testimony concerning the general effects of alcohol or drugs .on the user’s actions. See .Wilkerson. Wiggins is due no relief on this claim.
XI.
Wiggins next,argues that the prosecutor’s misconduct rendered his trial fundamentally unfair and violated state and federal law. He specifically cites several different instances in support of this contention.
When reviewing claims of prosecutorial misconduct we keep in mind the following:
“ ‘In reviewing allegedly improper pros-ecutorial comments, conduct, and questioning of witnesses, the task of this Court is to consider their impact in the context of the particular trial, and not to view the allegedly improper acts in the abstract.’ Bankhead v. State, 585 So.2d 97, 106 (Ala.Crim.App.1989), remanded on other grounds, 585 So.2d 112 (Ala. 1991), aff'd on return to remand, 625 So.2d 1141 (Ala.Crim.App.1992), rev’d on other grounds, 625 So.2d 1146 (Ala. 1993). ‘“Prosecutorial misconduct is a basis for reversing an appellant’s conviction only if, in the context of the entire trial and in light of any curative instruction, the misconduct may have prejudiced the substantial rights of the accused.’” Carroll v. State, 599 So.2d 1253, 1268 (Ala.Crim.App.1992), aff'd, 627 So.2d 874 (Ala.1993), quoting United States v. Reed, 887 F.2d 1398, 1402 (11th Cir.1989). The relevant question is whether the prosecutor’s conduct ‘so infected the trial with unfairness as to make the resulting conviction a denial of *804 due process.’ Donnelly v. DeChristoforo, 416 U.S. 637, 643, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974).”
Minor v. State, 914 So.2d 372, 415 (Ala. Crim.App.2004).
Also, “any possible prejudicial impact is greatly diminished by the court’s instructions that closing arguments áre not evidence.” People v. Willis, 409 Ill.App.3d 804, 814, 950 N.E.2d 265, 275, 351 Ill.Dec. 109, 119 (2011). “Arguments of counsel generally carry less weight with a jury than do instructions from the court.” Boyde v. California, 494 U.S. 370, 384, 110 S.Ct. 1190, 108 L.Ed.2d 316 (1990).
With these principles in mind, we review the challenged arguments and conduct of the prosecutor.
A.
First, Wiggins argues that the prosecutor improperly interjected his own views during his cross-examination of Wiggins. Specifically, Wiggins challenges the following exchange:
“[Prosecutor]: You know, when I listen to your testimony, Mr. Wiggins, I marvel at the lucidity of everything that you remember, except one thing. You remember everything. You remember how many grams of cocaine you got. You remember what was powder and what was rock. You remember how much you paid for it. You remember where you got the money. You remember what kind of beer you drank. You remember what kind of whiskey you drank. You remember what Brian was drinking and what he had to drink. You remember everything, except killing your best friend. That you don’t remember; is that right?
“[Wiggins]: I mean—
“[Prosecutor]: Is it right or not?
“[Wiggins]: Yeah.
“[Prosecutor]: That’s right. That’s what you want this jury to believe, isn’t it?
“[Wiggins]: I stated I remembered shooting him once.
“[Prosecutor]: Okay. Well, let’s talk about that. Do you remember shooting him once?
“[Wiggins]: Yes.
“[Prosecutor]: What were you thinking when you took this rifle and you see Kyle drive up and get out of his truck that he’s been out there helping his friend get out of a ditch around midnight—
“[Defense counsel]: Your Honor, if I might interpose an objection to the tone of the District Attorney and ask him — ask the Court to make him modify his volume.
“[Prosecutor]: Judge, this is a capital murder trial. It’s not a tea party. “The Court: Well, if you would not be so vociferous, Mr. Davis [prosecutor].
“[Prosecutor]: I apologize to the Court and the ladies and gentlemen of the jury, excuse me.
“[Prosecutor]: When you took this rifle and you saw your friend, as you describe him,.Kyle Cavins, get out of his wrecker that he had been working in to help his friend get out of a ditch, what were you thinking?
“[Wiggins]: Obviously, I wasn’t. Nothing.
“[Prosecutor]: No, No, obviously, you were. Obviously, you were, Mr. Wiggins, because, you see, you can’t do what you did if you don’t think about it. You have to think to do that. You have to think to do that. You have to think to do that.
“The Court: If you would ask a question, please, Mr. [Prosecutor],
*805 “[Prosecutor]: Were you thinking or not?
“The Court: Not make statements.
“[Prosecutor]: I’m sorry, Judge, I apologize.
[[Image here]]
“[Prosecutor]: You know that’s right, Mr. Wiggins, I forgot about that. Not only did you murder this man in the dark, you went and got you some dope, and then you came back and rifled his cold corpse again to see if there was maybe a little change you could get.
“[Defense counsel]: Your Honor, if there might be a question in there.
“[Prosecutor]: Is that correct?
“[Defense counsel]: I would object to the District Attorney testifying, Your Honor.
“The Court: Sustain the objection.”
(R. 1134-45.)
“The scope of cross-examination in Alabama is quite broad.” Ex parte Deardorff, 6 So.3d 1235, 1241 (Ala.2008). “Leading questions are permitted on cross-examination. When a party calls a hostile witness, an adverse party, or a witness identified with an adverse party, interrogation may be by leading questions,” See Rule 611(c), Ala. R. Evid. “The trial court shall exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence.” Deardorff, 6 So.3d at 1241.
“Cross-examination is the principal means by which the believability of a witness and the truth of his testimony are tested. Subject always to the broad discretion of a trial judge to preclude repetitive and unduly harassing interrogation, the cross-examiner is not only permitted to delve into the witness’ story to test the witness’ perceptions and memory, but the cross-examiner has traditionally been allowed to impeach, i.e., discredit the witness.”
Davis v. Alaska, 415 U.S. 308, 316, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974).
“‘A party is given wide latitude on cross-examination to test a witness’s partiality, bias, intent, credibility, or prejudice, or to impeach, illustrate, or test the accuracy of the witness’s testimony or recollection as well as the extent of his knowledge. Wells v. State, 292 Ala. 256, 292 So.2d 471 (1973); Housing Authority of City of Decatur v. Decatur Land Co., 258 Ala. 607, 64 So.2d 594 (1953); Hooper v. State, 585 So.2d 142 (Ala.Cr.App.1991), cert. denied, 503 U.S. 920, 112 S.Ct. 1295, 117 L.Ed.2d 517 (1992); C. Gamble, [McElroy’s Alabama Evidence, § 136.01 (4th ed.1991) ]. The range of cross-examination rests largely in the discretion of the trial court, and that court’s ruling will not be disturbed unless it clearly appears that the defendant was prejudiced by the ruling. Hooper v. State. However, ‘where the witness’ testimony is important to the determination of the issues being tried, there is little, if any, discretion in the trial court to disallow cross-examination.’ Wells v. State, 292 Ala. at 258, 292 So.2d at 473.”
Williams v. State, 710 So.2d 1276, 1327-28 (Ala.Crim.App.1996).
Here, the challenged conduct occurred during the prosecutor’s cross-examination of Wiggins — a defendant charged with capital murder. “Counsel is given wide latitude and has the right and duty to cross-examine vigorously a defendant who takes the stand in his own defense. ‘A [prosecutor] may ask a defendant ... questions tending to discredit [his] testimony, no matter how disparaging the question may be.’ ” State v. Rush, 340 N.C. 174, 186, 456 S.E.2d 819, 826 (1995). *806 As the United States Supreme Court has explained:
“A defendant may decide- not to take the witness stand because of the risk of cross-examination. But this is a choice of litigation tactics. Once a defendant decides to testify, ‘[the] interests' of the other party and regard for the function of courts of justice to ascertain the truth become relevant, and prevail in the balance of considerations determining the scope and limits of the privilege against self-incrimination.’ ” ■
Jenkins v. Anderson, 447 U.S. 231, 238, 100 S.Ct. 2124, 65 L.Ed.2d 86 (1980). “A trial is an adversary proceeding. The State had the right and the obligation to use all of the impeaching evidence it possessed in order to destroy the credibility of the defendant if he were to testify.” People v. McKibbins, 96 Ill.2d 176, 189, 70 Ill.Dec. 474, 480, 449 N.E.2d 821, 827 (1983).
.Although the prosecutor’s cross-examination of Wiggins was indeed vigorous, the prosecutor’s actions did npt constitute reversible error. For these reasons, Wiggins is due no relief on this claim.
B.
Wiggins next argues that the following argumen1> — which occurred in the State’s rebuttal closing argument in the guilt phase — was improper:
“A brilliant man, Albert Einstein, who was born an Austrian Jew near the turn of the century and formulated perhaps the greatest physics theories in the history of the world, he had to flee from the Nazis.. He went first to Switzerland and, ultimately, came to the United States. And they asked him after the Second World War, he was being interviewed, and the interviewer said to him, how to you think — what do. you think about the state , of the world. That was — we were in the middle of a Cold War at that time, and we were being threatened every day with the end of humanity. And he said, the world is an evil place and there is great danger in the world, but it’s not evil people that we have to fear, and this is a man who escaped the Holocaust. He escaped the murder of six million Jews. He was a Jew. It’s not the evil people we have to fear. It is the good people who see evil and do nothing, because there were many, millions of good people in Germany. They let the Nazis do what they wanted to do. That’s been true in this country before. There’s been evil done in this country. Good people didn’t do anything about it.
“What this man did is evil and it deserves the maximum punishment.”
(R. 1209-10.) Wiggins did not object to the challenged argument; thus, we review this claim for plain error. See Rule 45A, Ala, R.App. P.
When reviewing a prosecutor’s challenged remarks made in closing, we keep in mind the following:
“Wide discretion is allowed the trial court in regulating the arguments of counsel. Racine v. State, 290 Ala. 225, 275 So.2d 655 (1973). ‘In evaluating allegedly prejudicial remarks by the prosecutor in closing argument, ... each case must be judged on its own merits,’ Hooks v. State, 534 So.2d 329, 354 (Ala. Cr.App.1987), aff'd, 534 So.2d 371 (Ala. 1988), cert. denied, 488 U.S. 1050, 109 act. 883, 102 L.Ed.2d 1005 (1989) (citations omitted) (quoting Barnett v. State, 52 Ala.App. 260, 264, 291 So.2d 353, 357 (1974)), and the remarks must be evaluated in the context of the whole trial, Duren v. State, 590 So.2d 360 (Ala.Cr. App.1990), aff'd, 590 So.2d 369 (Ala. 1991). ‘In order to constitute reversible error, improper argument must be perti *807 nent to the issues at trial or its natural tendency must be to influence the finding of the jury.’ Mitchell v. State, 480 So.2d 1254, 1257-58 (Ala.Cr.App.1985) (citations omitted). • ‘To justify reversal because of an attorney’s argument to the jury, this court must conclude that substantial prejudice has resulted.’ Twilley v. State, 472 So.2d 1130, 1139 (Ala.Cr. App.1985) (citations omitted).”
Coral v. State, 628 So.2d 954, 985 (Ala. Crim.App.1992). To constitute error, the challenged conduct must have “so infected the trial with unfairness as to make the resulting conviction a denial of due- process.” Darden v. Wainwnght, 477 U.S. 168, 181, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986).
“Criminal trials are adversary proceedings ... and not social affairs. Argument of counsel should not be so restricted as to prevent reference, by way of illustration, to historical facts and public characters, or to principles of divine law or biblical teachings.” Wright v. State, 279 Ala. 543, 550-51, 188 So.2d 272, 279 (1966).
“[Cjounsel is afforded broad latitude in closing argument. This latitude, set out by the Court in' Nelms & Blum Co. v. Fink, 159 Miss. 372, 382-383, 131 So. 817, 820 (1930), has been referred to in the context of capital cases. In Nelms, we stated that ‘[cjounsel may draw upon literature, history, 'science, religion, and philosophy for material for his argument.’ Id. at 382-384, 131 So. 817. See Hansen v. State, 592 So.2d 114, 139-140 (Miss.1991); Shell v. State, 554 So.2d 887, 899 (Miss.1989), vacated on other grounds, 498 U.S. 1, 111 S.Ct. 313, 112 L.Ed.2d 1 (1990); Johnson v. State, 416 So.2d 383, 391.(Miss.1982).”
Carr v. State, 655 So.2d 824, 853 (Miss. 1995). Alabama courts have upheld references to Nazi war crimes and the Holocaust in the prosecutor’s closing argument. See Ex parte Musgrove, 638 So.2d 1360, 1368-69 (Ala.1993); Johnson v. State, 120 So.3d 1130 (Ala.Crim.App.2009).
The argument occurred almost at' the conclusion of the closing arguments. Immediately thereafter the circuit court gave the following instruction:
“That concludes the closing argument portion of the trial. The attorneys’ statements and argument are intended to help you understand the evidence and apply the law. However, their statements are not evidence, and you should disregard any remark, statement or argument which is not supported by the evidence or by the law as given to you by the Court.”
(R. 1211.)
Also,
“ ‘[wjhile this failure to object does not 'preclude review in a capital , case, it does weigh against any blaim of prejudice.’ Ex parte Kennedy, 472 So.2d [1106] at 1111 [ (Aia.1985) j ‘This court'has concluded that the failure to object to improper prosecutorial arguments ... should be weighed as part of our evaluation of the claim on the merits because of its suggestion-that the defense did not consider the comments iri question to be particularly harmful.’ Johnson v. Wainwright, 778 F.2d 623, 629 n. 6 (11th Cir.1985), cert. denied, 484 U.S. 872, 108 S.Ct. 201, 98 L.Ed.2d 152 (1987). ‘Plain error -is error which, when examined in the context of the - entire case,- is so obvious- that failure to notice it would seriously affect the fairness, integrity, and public reputation of the judicial proceedings.’ United States v. Butler, 792 F.2d 1528, 1535 (11th Cir.), cert. denied, 479 U.S. 933, 107 S.Ct. 407, 93 L.Ed.2d 359(1986).”
Kuenzel v. State, 577 So.2d 474, 489 (Ala. Crim.App.1990).
*808 Based on the above, we cannot say that the prosecutor’s argument “so infected the trial with unfairness as to make the resulting [verdict] a denial of due process.” See Darden v. Wainwright, 477 U.S. 168, 181, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986). Accordingly, we find no plain error in regard to this claim.
C.
Wiggins next argues that the prosecutor misstated the law regarding the defense of voluntary intoxication. Specifically, he challenges the following argument:
“I don’t remember is never a defense to a crime. I don’t remember, I want to repeat that, is never a defense to a crime. If the Defendant, Mr. Wiggins, had said to Heath Taylor, I don’t remember anything that happened, we would still be asking you to convict him because we got his DNA. We got Mr. Cavins’s DNA on his clothes. We matched those bullets up. We’ve got all kinds of evidence to convict him with if he just said, I don’t remember anything. That’s not a defense to a crime, any crime.. Do people get drunk, take drugs, and not remember? Sure, all the time. People black out and don’t remember parts of a thing or the whole thing. That’s not a defense. If it was, God help, us all.” .
(R. 1201-02.) This argument was made at the beginning of the State’s rebuttal argument in the guilt phase. Wiggins did not object to the argument. Therefore, we review this claim for plain error. See Rule 45A, Ala. R.App. P.
“When an accused contends that a prosecutor has made improper comments during a closing argument, the statements at issue must be viewed in the context of the evidence presented in the .case and the entire closing argument made to the jury — both defense counsel’s and the prosecutor’s.” Ex parte Musgrove, 638 So.2d 1360, 1368 (Ala.1993).
“Replies in kind are generally permissible. Pittman v. State, 153 Ala. 1, 45 So. 245 (1907); Bates v. State, 468 So.2d 207 (Ala.Crim.App.1985). Allowing replies in kind rests within the discretion of the trial court, McCullough v. State, 357 So.2d 397 (Ala.Crim.App.1978), and wide latitude is usually given regarding replies in kind. Richardson v. State, 354 So.2d 1193 (Ala.Crim.App.1978); Evans v. State, 338 So.2d 1033 (Ala.Crim.App.1976); Lane v. State, 46 Ala.App. 637, 247 So.2d 679 (1971); Moody v. State, 40 Ala.App. 373, 113 So.2d 787 (1959); Windham v. State, 35 Ala.App. 547, 50 So.2d 288 (1950); Gills v. State, 35 Ala. App. 119, 45 So.2d 44, cert. denied, 253 Ala. 283, 45 So.2d 51 (1950); York v. State, 34 Ala.App. 188, 39 So.2d 694 (1948), cert. denied, 252 Ala. 158, 34[39] So.2d 697 (1949); Walker v. State, 33 Ala.App. 614, 36 So.2d 117 (1948). ‘When the door is opened by defense counsel’s argument, it swings wide, and a number of areas barred to prosecutorial comment will suddenly be subject to reply. What otherwise would have been improper argument by the prosecutor will be seen as harmless.’ DeFoor, Prosecutorial Misconduct in Closing Argument, 1 Nova L.j. 443, 469-70 (1982-83).” .
Davis v. State, 494 So.2d 851, 854-55 (Ala. Crim.App.1986).
The prosecutor was responding to argument made by defense counsel. “Generally, a prosecutor’s statements “which are merely arguendo of his opinion of the case, are within the limits of allowable forensic discussion.’ ” Bankhead v. State, 585 So.2d 97, 108 (Ala.Crim.App.1989). There is no reversible error in regard to this claim; thus, Wiggins is due no relief.
*809 D.
Wiggins next argues that the prosecutor improperly compared Wiggins’s rights with those of the victim. Specifically, he challenges the following remarks made in closing by the prosecutor:
“I’m sorry, ladies and gentlemen, I have to speak to you this way. This is evil. You get to sit here and watch this guy, all shaved and clean and neat, get up there and tell you how terrible things have been for him. Mr. Cavins can’t tell you anything. I have to speak for Mr. Cavins. Mr. Smith has to speak for Mr. Cavins, and we have, and we’ve proved our case.”
(R. 1208-09.)
This Court has upheld a prosecutor’s comment in closing that he speaks for the victim’s family. “[W]e find no reversible error in a brief statement suggesting that the prosecutory attorney speaks for the victim’s family.” Henderson v. State, 583 So.2d 276, 286 (Ala.Crim.App.1990). See also Sanchez v. State, 41 P.3d 531, 535 (Wyo.2002) (“The prosecutor merely told the jury that it had the opportunity to speak for the victim. We do not perceive the comment as being an improper community outrage appeal or that it prejudiced [the defendant] unfairly.”); State v. Braxton, 352 N.C. 158, 204, 531 S.E.2d 428, 455 (2000) (“This Court has previously found no gross impropriety requiring intervention ex mero motu when a prosecutor has argued that he speaks for the victim.”).
Moreover, “statements of counsel in argument to the jury must be viewed as delivered in the heat of debate, such statements are usually valued by the jury at their true worth and are not expected to become factors in the formation of the verdict.” Bankhead v. State, 585 So.2d 97, 106 (Ala.Crim.App.1989).
Furthermore, none of the prosecutor’s arguments so infected the trial with unfairness that Wiggins was denied due process. See Darden v. Wainwright, supra. Accordingly, Wiggins is due no relief on his claim that prosecutorial misconduct denied him a fair trial.
Penalty-Phase Issues XII.
Wiggins next argues that the circuit court erred in admitting evidence that had no bearing on the statutory aggravating circumstances that the State was relying on to support a sentence of death. Specifically, Wiggins argues that the court erred in allowing the admission of prior-bad-act evidence.
Pursuant to § 13A-5-45(e), AlaCode 1975, at the penalty phase of a capital-murder trial, the State has the burden of establishing the existence of any aggravating circumstances beyond a reasonable doubt. The State also has the burden of disproving the factual existence of any mitigating circumstances as to which evidence is introduced. Section 13A-5-45(d), Ala. Code 1975, addresses the evidence that is admissible at the penalty phase of a capital-murder trial. This section states:
“Any evidence which has probative value and is relevant to sentence shall be received at the sentencing hearing regardless of its admissibility under the exclusionary rules of evidence, provided that the defendant is afforded a fair opportunity to rebut any hearsay statements. This subsection shall not be construed to authorize the introduction of any evidence secured in violation of the Constitution of the United States or the State of Alabama.”
(Emphasis added.) “Under the provisions of §§ 13A-5-45(c) and (d), the strict rules of evidence are not applicable to sentencing hearings.” Billups v. State, 72 So.3d 122, 132 (Ala.Crim.App.2010).
*810 With these principles in mind we review Wiggins’s claims raised in his brief to-this Court.
A,
Wiggins first argues that the circuit court erred in allowing Lawrence Games, a probation officer with the Georgia Department of Corrections, to testify that Wiggins failed to contact him for two years when he was Wiggins’s probation officer.
Games testified at the penalty phase that, at the time of Cavins’s murder in October 2005, Wiggins was on probation for a 10-year sentence for a 1997 robbery conviction in the State of Georgia. Wiggins’s probation began in November 2004 and was scheduled to be completed in May 2006.' The following occurred:
“[Prosecutor]: Did you at any time ever yourself meet Mr. Wiggins?
“[Games]: No.
“[Prosecutor]: You were unable to supervise him?
• “[Games]: No, he never reported in.
“[Prosecutor]: And you. said that you began or [was] supposed to begin supervision in November of 2004?
“[Games]: .Yes.
“[Prosecutor]: And during the time period from 2004, of November, until May of ’06, you never met him?
“[Games]: Never met him.”
(R. 1259.) Wiggins did not object to the above testimony; therefore, we review this claim for plain error. See Rule 45A, Ala. R.App. P.
At the sentencing hearing the State had the burden of proving any aggravating circumstance beyond a reasonable doubt. One of the aggravating circumstances the State relied on was that Wiggins’s was under a sentence of imprisonment at the time he committed the robbery/murder. See § 13A-5-49(l), Ala.Code 1975. Certainly, Wiggins’s conduct while on probation was a relevant issue of inquiry in the penalty phase and evidence of it was properly admitted pursuant to § 13A-5-45(d), Ala.Code 1975...
Accordingly, we find no error, much less plain error, in regard to this claim. Wiggins is due no relief on this claim.
B.
Wiggins next argues that the circuit" court erred in allowing the State to introduce" evidence of a nonstatutory aggravating circumstance. Specifically, Wiggins argues that during the penalty-phase cross-examination of Wiggins’s mother, Nancy Wadlington, the following occurred:
“[Prosecutor];- [Defense counsel] asked you about difficulties that [Wiggins] had with law enforcement. Now, his first difficulty was he had intercourse with an underage girl; is that right?
“[Wadlington]: So I understand, yes.”
(R. 1273.) Wiggins did not object to this line of questioning; therefore, wé review this claim for plain error. See Rule 45A, Ala. R.Ápp. P.
The record shows that on direct.examination, defense counsel asked Wadlington when she first learned of her son’s committing any criminal activity. Wadlington responded that it was ‘When he got in trouble with this young girl.” (R. 1270.)
Section 12-21-137, Ala.Code 1975, specifically provides: “The right of cross-examination, thorough and sifting, belongs to every party as to the witnesses called against him.” “A defendant cannot complain about the state’s inquiring-as to matters first brought .into the case by the defendant.” State v. Thomas, 820 S.W.2d 538, 545 (Mo.Ct.App.1991). “While evidence of á criminal defendant’s prior bad acts is generally inadmissible, a defendant *811 is not in a position to complain of the State inquiring about matters brought into the case by his own question.” State v. Fassero, 256 S.W.3d 109, 118 (Mo.2008).
Certainly, the State had a right to inquire into this matter after Wiggins opened the door on direct examination.
“ ‘The doctrine of opening the door allows a party to explore otherwise inadmissible evidence on cross-examination when the opposing party has made unfair prejudicial use of related evidence on direct examination.’ United States v. Lum, 466 F.Supp. 328, 334 (D.Del.) (citations omitted), aff'd without opinion, 605 F.2d 1198 (3d Cir.1979). ‘The doctrine ... is limited to' testimony that might explain or contradict the testimony offered by the opposing party on direct examination; it cannot be “subverted into a rule for injection of prejudice.” ’ Id. at 335 (quoting United States v. Winston, 447 F.2d 1236, 1240 (D.C.Cir.1971)).”
United States v. Durham, 868 F.2d 1010, 1012 (8th Cir.1989).
Moreover, “[t]o rise to the level of plain error, the claimed, error must not only seriously affect a defendant’s ‘substantial rights,’' but it must also have an unfair prejudicial impact on the jury’s deliberations.” Hyde v. State, 778 So.2d 199, 209 (Ala.Crim.App.1998). That standard was not satisfied in this case. Accordingly, Wiggins is due no relief on this claim.
XIII.
Wiggins argues that prosecutorial misconduct tainted the jury’s verdict in the penalty phase. Specifically, Wiggins challenges arguménts the prosecutor made in closing.
When reviewing these claims, we keep in mind the following:
“ ‘Counsel should be given wide latitude in arguing to the jury; and only where the defendant is prejudiced by the state’s argument is reversal mandated.’ Bayne v. State, 375 So.2d-1237, 1238 (Ala.1978), ‘If it can be said with fair assurance “that the error did not influence the' jury, or had but very slight effect, the .verdict and judgment should stand;” Stain [v. State, 273 Ala. 262, 266, 138 So.2d 703, 706 (1961)].’ Ex parte Wilhite, 485 So.2d 787, 788 (Ala. 1986). ‘In order to constitute reversible error, improper argument must be pertinent to the issues at trial or its natural tendency must be to influence the finding of the jury,,.. Prosecutorial statements which are merely trivial and nonprejudicial are • not grounds for. error.’ Mitchell v. State, 480 So.2d 1254, 1257-58 (Ala.Cr.App.1985). ‘There is no legal standard by which the prejudicial qualities of improper remarks of a solicitor in the trial of a case can be gauged. Each case must be determined on its own merits.’ Smith v. State, 282 Ala. 268, 291, 210 So.2d 826, -848 (1968). ‘Prose-cutorial misconduct is a basis for reversing an appellant’s conviction only if, in the context of the entire trial and in light of any curative instruction, the misconduct may have prejudiced the substantial rights of the accused.’ United States v. Reed, 887 F.2d 1398, 1402 (11th Cir.1989), cert. denied, 493 U.S. 1080, 110 S.Ct. 1136, 107 L.Ed.2d 1041 (1990).”
Carroll v. State, 599 So.2d 1253, 1268 (Ala.Cidm.App.1992). “Prosecutors are afforded wide latitude in closing argument.” People v. Kirchner, 194. Ill.2d 502, 549, 252 Ill.Dec. 520, 545, 743 N.E.2d 94, 119 (2000).
With these principles in mind we review the challenged conduct.
*812 A.
First, Wiggins asserts that the prosecutor argued facts not in evidence when he made the following argument at the conclusion of the penalty phase closing statements:
“His lawyer and Ms. Terrell, who I’m sure is a sincere woman, but she’s here because she doesn’t believe in the death penalty and because she finds mitigation in every case that she’s ever testified for, all of them.”
(R. 1313.)
Terrell testified in the penalty phase that for the last 11 years she had provided assistance to defense attorneys in developing mitigation evidence for clients facing a possible death sentence, that she has always found mitigation, and that she only took the cases that “merited her intervention.” (R. 1301.)
“A prosecutor as well as defense counsel has a right to present his impressions from the evidence, and [h]e may argue every legitimate inference from the evidence and may examine, collate, sift, and treat the evidence in his own way. Watson v. State, 398 So.2d 320, 328 (Ala.Cr.App.1980), writ denied, 398 So.2d 332 (Ala.), cert. denied, 452 U.S. 941, 101 S.Ct. 3085, 69 L.Ed.2d 955 (1981). Henderson v. State, 584 So.2d 841, 856-57 (Ala.Crim.App.1988), remanded on other grounds, 585 So.2d 862 (Ala.1991).”
Sneed v. State, 1 So.3d 104, 140 (Ala.Crim. App.2007). “The credibility of a witness is a proper subject for closing argument if it is based on the evidence or inferences drawn from it.” People v. Hudson, 157 Ill.2d 401, 445, 193 Ill.Dec. 128, 147, 626 N.E.2d 161, 180 (1993).
Although Terrell’s testimony certainly implied that she was sympathetic to those who faced a sentence of death, there was no definitive testimony that she was opposed to the death penalty.[11]
However, after reviewing the prosecutor’s remarks in relation to the record as a whole, we cannot say that the remarks constituted plain error or affected Wiggins’s substantial rights. See Ex parte Smith, 756 So.2d 957, 961 (Ala.2000). Accordingly, Wiggins is due no relief on this claim.
B.
Wiggins next argues that the prosecutor improperly urged the jury, based on his expert conclusion, that death was the appropriate punishment in this case. Specifically, Wiggins challenges the following argument;
“The just punishment for that is the death penalty, and I ask you to recommend to the Court, and that’s what it is from you, a recommendation, the judge makes the final decision, I ask you to recommend that in this case, the death penalty is the appropriate punishment. I ask you to ask yourselves, if not this case, if the death penalty is not appropriate in this case, when is it appropriate.”
*813 (R. 1314.) Wiggins did not object to this argument; thus, we review this claim for plain error. See Rule 45A, Ala. R.App. P.
In considering, and upholding, similar arguments made in closing we have stated:
“[A] prosecutor’s statement .indicating that under the law and the facts of the case, the jury has a duty to recommend a death sentence is not impermissible because the comment does not urge the jury to sentence the defendant to death without regard for the facts or law. Cf. McWhorter v. State, 781 So.2d 257, 321 (Ala.Crim.App.1999). Rather, such comments urge the jury to apply the facts to the law and to impose a death sentence. Id.; Windsor v. State, 89 So.3d 805, 829 (Ala.Crim.App.2011) (upholding prosecutor’s comment that *[t]he right thing to do is sentence Harvey Lee Windsor to death’).”
Wilson v. State, 142 So.3d 732, 777 (Ala.Crim.App.2010).
Here, the prosecutor did not urge the jury to disregard the law. He simply argued that a sentence of death was the appropriate sentence in this case based on the evidence. The prosecutor’s argument was not erroneous, and Wiggins is due no relief on this claim.
C.
Wiggins last argues that the cumulative effect of the prosecutorial misconduct mandates that he be granted a new trial. .
“To the extent that Revis argues that these alleged individual errors resulted in cumulative error that required a reversal of his conviction, ‘ “ ‘[bjecause we find no error in the specific instances alleged by the appellant,. we find no cumulative error.’ Lane v. State, 673 So.2d 825 (Ala.Crim.App.1995). See also McGriff v. State, 908 So.2d 961 (Ala. Crim.App.2000).” Calhoun v. State, 932 So.2d 923, 974 (Ala.Crim.App.2005).’ Harris v. State, 2 So.3d 880, 928 (Ala. Crim.App.2007), cert. denied, 555 U.S. 1155, 129 S.Ct. 1039, 173 L.Ed.2d 472 (2009).”
Revis v. State, 101 So.3d 247, 325 (Ala. Crim.App.2011). We likewise find no cumulative error in this case
XIV.
Wiggins next challenges several of the circuit court’s jury instructions in the penalty phase. When reviewing challenged jury instructions,-we keep in mind the following:
“A trial court has broad discretion when formulating its jury instructions. See Williams v. State, 611 So.2d 1119, 1123 (Ala.Cr.App.1992). When reviewing a trial court’s instructions, ‘ “the court’s charge must be -taken as a whole, and the portions challenged are not to be isolated therefrom or taken out of context, but rather considered together.” ’ Self v. State, 620 So.2d 110, 113 (Ala.Cf.App.1992) (quoting Porter v. State, 520 So.2d 235, 237 (Ala.Cr.App. 1987)); see also Beard v. State, 612 So.2d 1335 (Ala.Cr.App.1992); Alexander v. State, 601 So.2d 1130 (Ala.Cr.App. 1992).”
Williams v. State, 795 So.2d 753, 780 (Ala. Crim.App.1999). We review the' challenged instruction “as a reasonable juror would have interpreted [it].” Johnson v. State, 820 So.2d 842, 874 (Ala.Crim.App. 2000).
Defense counsel did not object to any of the circuit court’s jury instructions in the penalty phase. In fact, the following occurred at the conclusion of the circuit court’s jury instructions in the penalty phase:
“The Court:. Defense have anything further?
“[Defense counsel]: No, Your Honor.”-
*814 (K. 1332.) Because there were no objections, we review these claims for plain error. See Rule 45A, Ala. R.App. P.
“In setting out the standard for plain error review : of jury instructions, the court in' United States v. Chandler, 996 F.2d 1073, 1085, 1097 (11th Cir.1993), cited Boyde v. California, 494 U.S. 370, 380, 110 S.Ct. 1190, 108 L.Ed.2d 316 (1990), for the proposition that “an error occurs only when there is a reasonable likelihood that the jury applied the instruction in an improper manner.” Williams v. State, 710 So.2d 1276, 1306 (Ala.Cr.App.1996), aff'd, 710 So.2d 1350 (Ala.1997), cert. denied, 524 U.S. 929, 118 S.Ct. 2325, 141 L.Ed.2d 699 (1998).”
Pilley v. State, 789 So.2d 870, 882-83 (Ala. Crim.App.1998).
We address individually each claim Wiggins raises in his brief.
A.
First, Wiggins argues that the circuit, court’s instruction on mitigating circumstances was erroneous because, he says, the circuit court instructed the jury that the mitigating circumstances had to be proven to a “reasonable satisfaction.”
The record shows that prior to the start of the penalty phase, the circuit court gave a brief discussion of the format of the sentencing hearing and stated, in pertinent part:
“The State again would have the opportunity to go first, followed by the ‘defense, and then the State would have the opportunity to go a second time because the burden of proof is upon the State to prove at least one aggravating circumstance to the jury and that standard is beyond a reasonable doubt. The Defendant’s burden of proof of a mitigating circumstance is somewhat less than all reasonable doubt. It is a standard of reasonable satisfaction to the jury.”
(R. 1250) (emphasis added). Wiggins did not object to the circuit court’s challenged remarks. Accordingly, ■ we review this claim for plain error. See Rule 45A, Ala. R.App. P.
Clearly, the circuit court made a misstatement of the law in his remarks at the beginning of the penalty phase. In Alabama, “[t]he defendant has the burden of interjecting a mitigating circumstance; he does not ... have to establish the existence of a mitigating circumstance to the reasonable satisfaction of the jury.” Broadnax v. State, 825 So.2d 134, 214 (Ala. Crim.App.2000) (emphasis added).
“Section 13A-5-45(g), Ala.Code 1975, does not impose any burden on the defendant to prove mitigating circumstances to the jurors’ reasonable ■ satisfaction. Rather, our law requires the jurors to consider any mitigating circumstance interjected by the defendant and not disproved by the..State by a preponderance of the evidence. § 13A-5-45(g). See also Dill v. State, 600 So.2d 343 (Ala.Crim.App.1991), aff'd, 600 So.2d 372 (Ala.1992), cert. denied, 507 U.S. 924, 113 S.Ct. 1293, 122 U.Ed.2d 684 (1993).”
Ex parte Broadnax, 825 So.2d 233, 238 (Ala.2001) (Johnstone, J., concurring in the result in part and dissenting in part).
During the jury instructions in the penalty phase, the circuit court gave the following instruction:
“A mitigating circumstance does not have to be provided in the list that I’ve read to you in order for it to be considered by you. In addition to the mitigating circumstances previously specified, mitigating circumstances shall include any aspect of [Wiggins’s] character or record and any of the circumstances of the defense that [Wiggins] offers as a *815 basis for a sentence of life imprisonment without parole instead of death.
. “The defense has submitted a list of mitigating circumstances through one or more of its witnesses and that list of mitigating circumstances, some of these are included-in the list that I’ve read out to you, some of them are not., One, a dysfunctional family unit. Divorce among the family .at an early age and domestic violence at an early age. Two, damage to emotional development at an early age of [Wiggins]. Three, a permissive parent. Four, a behavior problem while in school. Five, he was never evaluated or treated or given treatment for. possible learning disorders. Six, [Wiggins] has a history of substance abuse both through alcoholic beverage and for drugs. Seven, a genetic disposition .of his family members to 'substance abuse. Eight, a.lack of treatment for substance abuse. Nine, diminished capacity or diminished responsibility due to intoxication at the time of the offense. Ten, remorse over the offense. Even, lack of substantial employment. And, twelve, admission to the capital murder and to the robbery. ■
“You are not required just to consider the ones that I have read oüt to you or in the list that I read out to you of the non-statutory ones that is presented by [Wiggins], You may consider any other mitigating circumstance" that you would consider from the trial itself and the evidence that was presented or from any other statements during the course of this sentencing recommendation hearing.
“A mitigating circumstance by the jury should be based on the evidence you have heard. When the factual existence of an offered mitigation circumstance is in dispute, the State shall have the burden of disproving the factual existence of that circumstance by preponderance of the evidence. The burden of disproving it by a preponderance of the evidence means that you will consider that the mitigating circumstance does exist, unless taking. the evidence as a whole'is more likely than not that the mitigating circumstance does not exist. Therefore, if there is a factual dispute over the existence of., a mitigating circumstance, then you should find and consider that mitigating circumstance, unless you find the evidence is such, .that it is more likely than not that the mitigating circumstance does not exist.”
(R. 1323-25.) •
Given that the challenged remark was not made .in the .circuit court’s instructions to the jury and .that during jury, instructions the circuit court gave very thorough and accurate instructions on the correct law, we find that the court’s misstatement did not rise to the level of plain error. See Smith v. State, 795 So.2d 788, 835 (Ala. Crim.App.2000). See also Woods v. State, 13 So.3d 1, 41 n. 1 (Ala.Crim.App.2007) (“Based on our review of the court’s oral charge as a whole, we conclude that the jury was properly informed, ’ and understood, that the burden was on the State to disprove any mitigating circumstances offered by Woods, despite the single misstatement by the trial court.”). For these reasons, Wiggins is due no relief on this claim.
B.
Wiggins next argues that the circuit .court’s instruction ■ on weighing the aggravating circumstances and the mitigating circumstances was erroneous because, he says, the circuit court failed to instruct the jury that if it found the aggravating circumstances and the mitigating circumstances to be equally balanced they must recommend a sentence of life impris *816 onment without the possibility of parole. He cites Ex parte Bryant, 951 So.2d 724 (Ala.2002), in support of his contention. Wiggins did not object to this jury instruction; therefore, we review this claim for plain error. See Rule 45A, Ala. R.App. P.
In Ex parte Bryant, the Alabama Supreme Court found plain error in the circuit court’s instructions on the weighing process at the penalty phase of Bryant’s capital-murder trial because the instructions implied that the jury could recommend death even if it found the existence of no aggravating circumstances. The Alabama Supreme Court has revisited this issue on several occasions since its decision in Bryant. Recently the Supreme Court in Ex parte Mills, 62 So.3d 574 (Ala.2010), again declined to find plain error in the circuit court’s instructions on the weighing process and stated:
“In Bryant, the trial court’s instructions to the jury suggested that the jury could recommend the death sentence if the mitigating circumstances did not outweigh the aggravating circumstances. In other words, the instructions suggested that the jury could recommend the death sentence if the aggravating circumstances and the mitigating circumstances were of equal weight. 951 So.2d at 730. Even more significant to the plain-error analysis in Bryant, however, was that the trial court’s instructions invited the jury to recommend a sentence of death without finding the existence of any aggravating circumstance. 951 So.2d at 730.
In [Ex parte ] McNabb, [887 So.2d 998 (Ala.2004),] the sentencing instructions included the following:
“‘Now, ladies and gentlemen, if, after a full and fair consideration of all of the evidence in the case, you are convinced beyond a reasonable doubt that at least one aggravating circumstance does exist and you are convinced that the aggravating circumstance outweighs the mitigating circumstances, then your verdict would be: “We, the jury, recommend that the defendant be punished by death, and the vote is as follows.... ” However, if after a full and fair consideration of all of the evidence in the case, you determine that the mitigating circumstances outweigh any aggravating circumstance or circumstances that exist, or you are not convinced beyond a reasonable doubt that at least one aggravating circumstance does exist, your verdict should be to recommend the punishment of life imprisonment without parole....’
“887 So.2d at 1001 .... This Court in McNabb concluded that these instructions did not constitute plain error' because the trial court had not taken the additional step of inviting the jury to recommend a death sentence without finding the existence of any aggravating circumstance. Specifically, this Court stated in McNabb:
“ ‘The charge in this case was not infected with the peculiar error present in [Ex parte ] Bryant [, 951 So.2d 724 (Ala.2002)], that is, the .jury in this case was not invited to recommend a sentence of death without finding any aggravating circumstance. It was that invitation in Bryant that caused the error in that case to rise to the level of plain error, rather than error reversible only by a proper objection. Thus, in this case, although the court did not specifically instruct the jury what to do if it found the mitigating and aggravating circumstances equally balanced, we cannot conclude, considering the charge in its entirety, that the error “seriously af *817 fect[ed] the fairness, integrity or public reputation of [these] judicial proceedings,” Ex parte Davis, 718 So.2d [1166,] at 1173-74 [ (Ala.1998) ], so as to require a reversal of the sentence.’
“887 So.2d at 1004.”
Mills, 62 So.3d at 599-600. The Supreme Court in Mills found that the court’s instructions, taken as a whole, correctly informed the jury that the only way it could recommend a sentence of death was if it first determined that an aggravating circumstance did exist and if that circumstance or those circumstances outweighed the mitigating circumstances.
Here, the circuit court twice instructed the jury as follows:
“The law also provides that whether death or life imprisonment without parole should be imposed upon [Wiggins] depends on whether any aggravating circumstances exist, and if so, whether the aggravating circumstance or circumstances outweigh the mitigating circumstances.”
(R. 1316.) The circuit court further instructed:
“If the jury is not convinced beyond a reasonable doubt based upon the evidence that one or more aggravating circumstances exists, then the jury must recommend that [Wiggins’s] punishment be life imprisonment without parole. ...”
(R. 1318.)
In this case, the circuit court clearly instructed the jury that it could recommend a sentence of death only if an aggravating circumstance existed and only if that circumstance or those circumstances outweighed the mitigating circumstances. The instruction here did not violate Bryant and its progeny. For these reasons, we find no plain error in the court’s instructions on weighing the aggravating and the mitigating circumstances. Wiggins is due no relief on this claim.
C.
Wiggins next argues that the circuit court diminished the jury’s responsibility by referring.to its verdict in the penalty phase as a recommendation.
This Court has stated the following concerning an instruction that the jury’s verdict is a recommendation in the penalty phase:
“First, the circuit court did not misinform the jury that its penalty phase verdict is a recommendation. Under § 13A-5-46, Ala.Code 1975, the jury’s role in the penalty phase of a capital case is to render an advisory verdict recommending a sentence to the circuit judge. It is the circuit judge who ultimately decides the capital déféndant’s sentence, and, ‘[w]hile the jury’s recommendation concerning sentencing shall be given consideration, it is not binding upon the courts.’ § 13A-5-47, Ala.Code 1975. Accordingly, the circuit court did not misinform the jury regarding its role in the penalty phase. -
“Further, Alabama courts'have repeatedly held that ‘the comments of the prosecutor and the instructions of the trial court accurately informing a jury of the extent of its sentencing authority and that its sentence verdict was “advisory” and a “recommendation” and that the trial court would make the final decision as to sentencé does not violate Caldwell v. Mississippi [, 472 U.S. 320 (1985)].’ Kuenzel v. State, 577 So.2d 474, 502 (Ala.Crim.App.1990) (quoting Martin v. State, 548 So.2d 488, 494 (Ala. Crim.App.1988)). See also Ex parte Hays, 518 So.2d 768, 777 (Ala.1986); White v. State, 587 So.2d 1236 (Ala. Crim.App.1991); Williams v. State, 601 *818 So.2d 1062, 1082 (Ala.Crim.App.1991); Deardorff v. State, 6 So.3d 1205, 1233 (Ala.Crim.App.2004); Brown v. State, 11 So.3d 866 (Ala.Crim.App.2007); Harris v. State, 2 So.3d 880 (Ala.Crim.App. 2007): Such comments, without more, do not minimize the jury’s role and responsibility in sentencing and do not violate the United ' States Supreme Court’s holding in Caldwell. Therefore, the circuit court did not err by informing the jury that its penalty-phase verdict was a recommendation.”
Albarran, 96 So.3d at 210. For the reasons-stated, above, Wiggins,is due no relief on this claim.
D.
Wiggins next argues that the circuit court erred in failing to reinstruct the jury on the burden of reasonable doubt in the penalty phase.
The record shows that at the beginning of the circuit court’s instructions in the penalty phase, the court gave the following instruction: , ...
“It is my duty to again instruct you as to the charge and to charge you as to .the law in this sentencing hearing. In charging you,, I want to remind you as a juror of the instructions that I gave you previously last week concerning the basic law and defining the terms of reasonable doubt, especially, as well as your duties and functions as a juror. If any one of you feel it is necessary, I’ll recharge you as to each and every one of these principles of law.”
(R. 1315.) Wiggins did not object to the failure to reinstruct the jury on reasonable doubt; therefore, we review this claim only for plain error. See Rule 45A, 41a. R.App. P.
This Court addressed this issue in Vanpelt. v. State, 74 So.3d 32 (Ala.Crim.App. 2009), and stated:
“[Tjhis court notes that the ‘Constitution neither prohibits trial courts from defining reasonable doubt nor requires them to do so as a matter of course.’ Victor v. Nebraska, 511 U.S. 1, 5, 114 S.Ct. 1239, 127 L.Ed.2d 583 (1994). Further, this court has ‘previously held, that there is ño plain error when a trial court, in the penalty phase of a capital trial, relies on a reasonable-doubt instruction it had given in the guilt phase of the proceedings.’ Johnson v. State, 820 So.2d 842, 875-76 (Ala.Crim.App.2000). Specifically, in Griffin v. State, [790 So.2d 267 (Ala.Crim.App.1999),] this court held that the circuit court’s failure to rein-struct the jury on the definition of reasonable doubt during the penalty phase did not constitute ‘plain- error because the circuit court thoroughly and correct ly instructed the jury on reasonable doubt in the guilt phase and little time had passed' between the guilt phase and the penalty phase. 790 So.2d 267, 338 (Ala.CrimApp.1999), overrüled on other grounds, Ex parte Griffin, 790 So.2d 351 (Ala.2000). See also Johnson v. State, 820 So.2d 842, 876 (Ala.Crim.App.2000) (same). This .court has further explained that a circuit court’s reference to .its earlier reasonable-doubt instruction is not improper because ‘[i]t is assumed that the jury will consider the previously given instructions along with those given in the supplemental charge.’ Griffin, 790 So.2d at 338.
“In the present case, the circuit court thoroughly and correctly instructed the jury on reasonable doubt during the guilt phase. (R. 978-79.)”
74 So.3d at 96.
Here, the jury’s verdict in the guilt phase established the -aggravating circumstance that the murder was committed during a robbery. The reasonable-doubt instruction in the penalty phase applied *819 only to the State’s burden of proving aggravating circumstances. • The circuit court gave very thorough and detailed instructions on reasonable doubt in the guilt phase and asked if those instructions needed to be repeated in the penalty phase. For these reasons, we find no reversible error in the circuit court’s failure to rein-struct the jury on the issue of reasonable doubt in the penalty phase after the jury had been given that instruction in the guilt phase. Wiggins is due no relief on this claim.
XV.
Wiggins next argues that death-qualifying the prospective jurors'resulted in a jury that was conviction prone, a jury, he says, that violated his constitutional rights to be tried by an impartial tribunal.
As this Court has repeatedly stated:
“A jury composed exclusively of jurors who have been death-qualified in accordance with the test established in Wainwright v. Witt, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985), is considered to be impartial even though it may be more conviction prone than a non-death-qualified jury. Williams v. State, 710 So.2d 1276 (Ala.Cr.App.1996). See Lockhart v. McCree, 476 U.S. 162, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986). Neither the federal nor the state constitution prohibits the state from death-qualifying jurors in capital cases. Id,; Williams; Haney v. State, 603 So.2d 368, 391-92 (Ala.Cr.App.1991), aff'd, 603 So.2d 412 (Ala.1992), cert. denied, 507 U.S. 925, 113 S.Ct. 1297, 122 L.Ed.2d 687 (1993).”
Davis v. State, 718 So.2d 1148, 1157 (Ala. Crim.App.1995).
Other states have likewise held that death-qualifying a jury does not violate the state constitution or create a conviction-prone jury. See State v. Williams, 355 N.C. 501, 552, 565 S.E.2d 609, 639 (2002) (“[T]his Court has held that ‘death-qualifying’ a jury is constitutional under both the federal and state Constitutions.”); State v. Alvarez, 872 P.2d 450 (Utah 1994) (holding that death-qualifying the jury does not offend Utah Constitution); State v. Hughes, 106 Wash.2d 176, 188, 721 P.2d 902, 908 (1986) (“The process [of death-qualifying jurors] does not result in a jury that is unrepresentative of the community and is not violative of either the state or federal constitution.”).
Wiggins was not denied his right to an impartial jury after the jury was death-qualified during voir dire examination. Accordingly, Wiggins is due no relief on this claim.
XVI.
Wiggins next argues" that his death sentence must be vacated because, he says, it violates the United States Supreme Court’s holding in Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002). He argues that the Alabama Supreme Court’s decision in Ex parte Wal-drop, 859 So.2d 1181 (Ala.2002), is erroneous because the Waldrop Court relied on a United States Court of Appeals case that was issued before the Supreme Court released Ring. Wiggins contends that because the judge, and not the jury, found the aggravating circumstance that sup-, ported a death sentence, his sentence violates Ring.
In Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), the United States Supreme Court held that any fact that increases a sentence above the statutory maximum must be presented to a jury and proven beyond a reasonable doubt. The United States Supreme Court in Ring extended the Ap-prendi holding to death-penalty cases.
*820 The Alabama Supreme Court in Ex parte Waldrop, held:
“Ring [v. Arizona, 536 U.S. 584 (2002),] and Apprendi [v. New Jersey, 530 U.S. 466 (2000),] do not require that the jury make every factual determination; instead, those cases require the jury to find beyond a reasonable doubt only those facts that result in ‘an increase in a defendant’s authorized punishment ... ’ or ‘ “expose[ ] [a defendant] to a greater punishment....’” Ring, 536 U.S. at 602, 604, 122 S.Ct. at 2439, 2440 (quoting Apprendi 530 U.S. at 494, 120 S.Ct. 2348). Alabama law requires the existence of only one aggravating circumstance in order for a defendant to be sentenced to death. Ala.Code 1975, § 13A-5-45(f). The jury in this case found the existence of that one aggravating circumstance: that the murders were committed while Waldrop was engaged in the commission of a robbery. At that point, Waldrop became ‘exposed’ to, or eligible for, the death penalty. The trial court’s subsequent determination that the murders were especially heinous, atrocious, or cruel is a factor that 'has application only in weighing the mitigating circumstances and the aggravating circumstances, a process that we held earlier is not an ‘element’ of the offense.”
Waldrop, 859 So.2d at 1190. This Court is bound by the decisions of the Alabama Supreme Court and has no authority to set aside those decisions. See § 12-3-16, Ala. Code 1975.
The logic of Waldrop applies in this case. By virtue of the jury’s verdict in the guilt phase convicting Wiggins of robbery/murder, Wiggins was eligible for a death sentence. Therefore, the verdict in this case does not violate Ring — Wiggins is due no relief on this claim.
XVII.
Wiggins next argues that double counting robbery as both an element of the capital-murder offense and an aggravating circumstance violates his right to due process and his right to a fair and impartial jury.
This issue was not raised in the circuit court; therefore, we review this claim for plain error. See Rule 45A, Ala. R.App. P.
This Court has repeatedly stated:
“Contrary to Vanpelt’s assertions, there is no constitutional or statutory prohibition against double counting certain circumstances as both an element of the offense and an aggravating circumstance. See § 13A-5-45(e), Ala.Code 1975 (providing that ‘any aggravating circumstance which the verdict convicting the defendant establishes was proven beyond a reasonable doubt at trial shall be considered as proven beyond a reasonable doubt for purposes of the sentence hearing’). The United States Supreme Court, the Alabama Supreme Court, and this court have all upheld the practice of double counting. See Lowenfield v. Phelps, 484 U.S. 231, 241-46, 108 S.Ct. 546, 98 L.Ed.2d 568 (1988) (‘The fact that the aggravating circumstance duplicated one of the elements of the crime does not make this sentence constitutionally inñrm.’); Tuilaepa v. California, 512 U.S. 967, 972, 114 S.Ct. 2630, 129 L.Ed.2d 750 (1994) (‘The aggravating circumstance may be contained in the definition of the crime or in a separate sentencing factor (or in both).’); Ex parte Kennedy, 472 So.2d 1106, 1108 (Ala.1985) (rejecting a constitutional challenge to double counting); Brown v. State, 11 So.3d 866 (Ala.Crim. App.2007); Harris v. State, 2 So.3d 880 (Ala.Crim.App.2007); Jones v. State, 946 So.2d 903, 928 (Ala.Crim.App.2006); Peraita v. State, 897 So.2d 1161, 1220-21 *821 (Ala.Crim.App.2003); Coral v. State, 628 So.2d 954 (Ala.Crim.App.1992); Haney v. State, 603 So.2d 368 (Ala.Crim.App. 1991). Because double counting is constitutionally permitted and statutorily required, Vanpelt is not entitled to any relief on this issue, § 13A-5-45(e), Ala. Code 1975.”
Vanpelt, 74 So.3d at 89.
Double counting the felony of robbery as both an element of the capital-murder offense and an aggravating circumstance did not violate Wiggins’s constitutional rights — he is due no relief on this claim.
xvm.
Wiggins next argues that evolving standards of decency have rendered Alabama’s method of execution unconstitutional as being cruel and unusual punishment.
In Alabama, the primary method of execution is lethal injection. Section 15-18-82.1(a), Ala.Code 1975. The constitutionality of Alabama’s method of execution has been addressed by the Alabama Supreme Court in Ex parte Belisle, 11 So.3d 323 (Ala.2008). The Belisle Court stated:
“The Supreme Court upheld the constitutionality of Kentucky’s method of execution, Baze [v. Rees, 553 U.S. 35, 62,] 128 S.Ct. [1520] 1538 [170 L.Ed.2d 420 (2008)], and noted that ‘[a] State with a lethal injection protocol substantially similar to the protocol we uphold today would not create a risk that meets this standard.’ Baze, [553 U.S. at 61], 128 S.Ct. at 1537. Justice Ginsburg and Justice Souter dissented from the main opinion, arguing that ‘Kentucky’s protocol lacks basic safeguards used by other States to confirm that an inmate is unconscious before injection of the second and third drugs.’ Baze, [553 U.S. at 114], 128 S.Ct. at 1567 (Ginsburg, J., dissenting). The dissenting Justices recognized, however, that Alabama’s procedures, along with procedures used in Missouri, California, and Indiana ‘provide a degree of assurance — missing from Kentucky’s protocol — that the first drug had been properly administered.’ Baze, [553 U.S. at 121], 128 S.Ct. at. 1571 (Ginsburg, J., dissenting).
. “The State argues, and we agree, that Belisle,- like the inmates in Baze, cannot meet his burden of demonstrating that Alabama’s lethal-injection protocol poses a substantial risk of harm by asserting the mere possibility that something may go wrong. ‘Simply because an execution method-may result in pain, either by' accident or as an inescapable consequence of death, does not establish the sort of “objectively intolerable risk of harm” that qualifies as cruel and unusu-. al.’ Baze, [553 U.S. at 50], 128 S.Ct. at 1531. Thus, we conclude that Alabama’s use of lethal injection as a method of execution does not violate the Eighth Amendment to the United .States Constitution.” ,
Ex parte Belisle, 11 So.3d 323, 339 (Ala. 2008).
This Court is bound by the decisions of the Alabama Supreme Court. Alabama’s method of execution does not violate the Eighth Amendment to the United States Constitution, and Wiggins is due no relief on this claim.
XIX.
Last, as required by § 13A-5-53, Ala. Code 1975, we must consider the propriety of Wiggins’s capital-murder conviction and the sentence of death.
Wiggins was convicted of murdering Kyle Cavins during the course of a robbery, an offense defined as capital by § • 13A-5-40(a)(2), Ala.Code 1975.
The record shows that Wiggins’s sentence was not imposed under the influence *822 of passion, prejudice, or any other arbitrary factor. See § 13A-5~53(b)(T), Ala. Code 1975.
The circuit court found the existence of three aggravating circumstances: that the murder was committed while Wiggins was under a sentence of imprisonment — -Wiggins was on parole for a Georgia conviction at the time of the murder, § 13A-5-49(l), Ala.Code 1975; that Wiggins had previously been convicted of a felony involving the use of violence — Wiggins had been convicted of attempted robbery in the State of Georgia, § 13A~5-49(2), Ala,Code 1975; and that Wiggins committed the murder during the course of. a robbery, § 13A-5-49(4), Ala. Code 1975,
' The circuit court stated the following concerning the statutory mitigating circumstances:
“The capacity of the Defendant, David H. Wiggins, to appreciate the criminality of his cdnduct or to conform his conduct to the requirements of law was diminished due to voluntary intoxication by alcoholic beverages and crack cocaine. Evidence at trial indicated the Defendant, David H. Wiggins, had consumed beer and ingested crack cocaine prior to the murder of Kyle F. Cavins. The degree of his intoxication was not to .an extent that [Wiggins] was unable to distinguish right from wrong, but his capacity to appreciate the wrongfulness of his actions was lessened by voluntary intoxication.”
(C.R, 19.) Concerning the nonstatutory mitigating circumstances, the circuit court stated:
“1. David H. Wiggins’s first two years of life were spent in a dysfunctional family unit in which his mother was subjected to verbal and physical abuse by [Wiggins’s] father. His mother and father divorced when David H. Wiggins was about two years old.
“2. Testimony of JoAnne Terrell, a mitigation specialist, established impaired emotional development of the Defendant, David H. Wiggins, as a mitigating circumstance.
“3. David H.' Wiggins grew up in a home with a permissive parent. His mother bought alcoholic beverages for him as a teenager and testified that she paid money he owed to crack cocaine dealers.
“4. David H. Wiggins was a behavior problem in school.
“5. David H. Wiggins was hot evaluated or given treatment for learning disabilities or for his antisocial behavior while in school.
“6, David H. Wiggins was addicted to alcohol as a teenager and has a history of substance abuse.
“7. His family may have a genetic predisposition to alcoholism. His father and other family members are or were alcoholics.
“8. David H. Wiggins never received treatment for substance abuse.
“9. Diminished capacity or diminished responsibility due to intoxication at the time of the capital murder.
“10. The Defendant, David H. Wiggins, expressed remorse over the capital murder.
“11. The Defendant, David H. Wiggins, had a lack of substantial employment and only had an eighth grade education.
“12. The Defendant, David H. Wiggins, admitted to the murder of Kyle F. Ca-vins.”
(C.R. 21-22.)
Section 13A-5-53(b)(2), Ala.Code 1975, requires that this Court independently weigh the aggravating and the mitigating circumstances. After an independent weighing we are convinced that the death *823 penalty was the appropriate sentence in this case.
Section 13A-5-53(b)(3), Ala.Code 1975, requires that we determine whether Wiggins’s sentence is disproportionate or . excessive to .penalties imposed in similar cases. Wiggins’s sentence is neither. “In fact, two-thirds of the death sentences imposed in Alabama involve cases of robbery/murder.” McWhorter v. State, 781 So.2d 257, 330 (Ala.Crim.App.1999).
Last, as required by Rule 45A, Ala. R.App. P., we have searched the record for any error that may have adversely affected Wiggins’s substantial rights and have found none.
For the foregoing reasons, we affirm Wiggins’s capital-murder conviction and sentence of death and his conviction for robbery and his sentence of life imprisonment for that conviction.
AFFIRMED.
WELCH and JOINER, JJ., concur.
KELLUM, J., concurs in the result.
WINDOM,- P.J., recuses herself.

. "The Alabama Supreme Court has adopted federal case law defining plain error...." Ex parte Womack, 435 So.2d 766, 769 (Ala.1983).

. Rule 39, Ala. R.App. P., was amended effective May 19, 2000. The Alabama Supreme Court" is no longer required to conduct a plain-error review.

.- This issue is discussed in-depth in Part II of this opinion.

. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

. The counterpart in .the Federal Rules of Evidence, Rule 615, Fed.R.Evid., contains the word ''shall” instead of "may,”

. This statute .provides in pertinent part: "At .the request of a party the court shall order witnesses' excluded so that they cannot hear the testimony of other witnesses.” (Emphasis added.) .

. To protect the anonymity of the jurors, we are using their initials where appropriate.

. This juror was an alternate and for Batson purposes was deemed to have been struck.

. "Rule 404(b), Ala. R. Evid., is identical to Rule 404(b), Fed.R.Evid. '[C]ases interpreting the Federal Rules of Evidence will constitute authority for construction of the Alabama Rules of Evidence.’ ” Ex parte Billups, 86 So.3d 1079, 1085 n. 4 (Ala.2010).

. Terrell did testify in the penalty phase as a mitigation expert.

. Many courts have found that a prosecutor's argument in closing referencing facts not in evidence may constitute harmless error. See State v. Benjamin, 86 Conn.App. 344, 861 A.2d 524 (2004); Martinez v. State, 17 S.W.3d 677 (Tex.Crim.App.2000); Robbins v. State, 243 Ga.App. 21, 532 S.E.2d 127 (2000); Torres v. State, 962 P.2d 3 (Okla.Crim.App.1998); Peoples v. United States, 640 A.2d 1047 (D.C. 1994); State v. Hart, 94 Ohio App.3d 665, 641 N.E.2d 755 (1994); People v. Lane, 256 Ill.App.3d 38, 195 Ill.Dec. 218, 628 N.E.2d 682 (1993); Morrison v. State, 98 Md.App. 444, 633 A.2d 895 (1993); Sadler v. State, 846 P.2d 377 (1993).